Anne **GARDETTO**, Plaintiff,

v.

Roy **MASON**, individually, and in his official capacity, and Eastern Wyoming College, Defendants.

No. 93–CV–0328–B.

United States District Court,
D. Wyoming.

June 7, 1994.

Patrick E. Hacker, Cheyenne, WY, for plaintiff.

Mayo Sommermeyer, Kent N. Campbell, Fort Collins, CO, for defendants.

---

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BRIMMER, District Judge.

The above-entitled matter having come before the Court on the Defendants' Motions for Summary Judgment, and the Plaintiff's Opposition thereto, and the Court, having considered the materials on file both in support of and in opposition thereto, having heard oral argument, and being fully advised in the premises, hereby FINDS and ORDERS as follows:

### Background [1]

This case presents a paradigmatic example of the fundamental importance in our society of the values enshrined in the First Amendment to the Constitution. The parties are familiar with the facts of this case, and the Court will therefore briefly summarize only the salient facts.

Plaintiff Anne Gardetto is a twenty year, tenured employee of Eastern Wyoming College ("EWC"). Defendant Roy Mason was, at all relevant times, the President of EWC. The plaintiff's primary role was in working with so-called "non-traditional students" which includes individuals who are economically disadvantaged and/or who were members of minority groups. The programs that the plaintiff developed were targeted for these individuals, and these programs were very successful in increasing enrollment of non-traditional students. In addition, the plaintiff's efforts were recognized for their exemplary nature by various accrediting organizations.

Defendant Mason initially praised the plaintiff's efforts, and he indicated that he would give these programs the financial support and assistance that they required. As time went on, however, and after the plaintiff spoke out on various matters relating to the administration's views on matters that directly and indirectly affected the plaintiff's work,

the light most favorable to the non-moving party. See Barber v. General Elec. Co., 648 F.2d 1272, 1276 n. 1 (10th Cir.1981).

the college's position towards the plaintiff and her efforts changed markedly.

The first significant event occurred in December of 1991, when the administration, led by defendant Mason, attempted to recreate a reduction-in-force committee. The plaintiff and other faculty and staff members were vocal opponents of this plan, and they were successful in their efforts to have the policy rejected.

Three months later, in the early part of February of 1992, during a faculty forum, defendant Mason began making comments to the effect that it was now time to start recruiting the "proper" students to the university. Similar comments were espoused by members of the Board of Trustees.

In April of 1992, the board and defendant Mason decided to eliminate the position that had been held by a woman named Mary McBroom, who supervised one of the plaintiff's programs. The plaintiff publicly, openly and vehemently spoke out in opposition to this decision, one which aroused a great deal of public interest. The debate over this issue at the board meeting was attended by a standing room only crowd and was covered by the local newspapers. Subsequently, EWC settled the dispute with Ms. McBroom by offering her a grant funded position that had recently become available.

At around the same time as the McBroom debate, the plaintiff moved for a vote of no-confidence as to Mason's leadership and his plans for reorganization. It appears that the vote failed to garner adequate support.

On November 10, 1992, the plaintiff had a conversation with board member John Patrick in her office. Mr. Patrick told her to be careful because her job was "on thin ice," referring to defendant Mason. Mr. Patrick went on to advise the plaintiff that it would be better if she let other women confront Mason about controversial issues. He concluded by telling the plaintiff that she should not confront Mason about any other matters that might arise.

On November 11, 1992, defendant Mason was interviewed by a Torrington newspaper regarding the settlement of the McBroom issue. Although the subject of the interview was the McBroom rehiring, some of the defendant's statements were directed at the plaintiff's job performance. Mason made a statement to the effect that the expense of the attorney's fees, and for that matter, the entire McBroom conflict, could have been avoided if the plaintiff had simply done her job, something that had heretofore never been questioned or challenged. This personal attack on the plaintiff resulted in a petition to the board by EWC faculty members who were outraged by Mason's comments. The board responded to the petition, indicating that while it agreed that these statements should not have been discussed publicly by way of a newspaper, it nonetheless agreed with the substance of Mason's comments.

In the spring of 1993, an issue arose as to whether Mason possessed the doctoral degree that he claimed he had. Allegations arose that he did not have this degree but that he nonetheless permitted himself to be listed as a "doctor" in the college catalogue and that he wore doctoral robes at graduation. This matter was also openly discussed in the local newspapers. At around the same time, defendant Mason advocated the closing of the Adult Re-Entry Center which was supervised by the plaintiff. Also at the same time, members of the faculty again raised the issue of a vote of no-confidence as to Mason. This vote, unlike the first one, passed. Mason was outraged, and he asserted that this action was the result of a few individuals who had "their own agendas."

On May 10, 1993, the plaintiff's attorney filed a governmental claim with the board of trustees alleging harassment, retaliatory action based on the exercise of protected rights and defamation. The claim was rejected fifteen days later. Three days later, on May 28, 1993, defendant Mason, without warning, summarily suspended the plaintiff from her employment for eleven days with pay.[2] The grounds for the suspension were threefold:

2. Even though the plaintiff was only suspended, she was ordered by Mason to remove her personal belongings from her office by noon that day. In addition, she was told to return her keys before she left and all of her rights as a faculty member of the university were temporarily removed as well.

(1) an alleged failure to obtain approval for the submission of a grant application; (2) an alleged protocol violation for an incident involving Jane Sullivan; and (3) an allegedly improper conversation between the plaintiff and an individual named Dr. Gonzales.

As for the grant application dispute, the plaintiff alleges that she was unable to obtain Mason's approval, while she was hospitalized, because of the combination of a filing deadline and the fact that Mason was unavailable until after the deadline passed. The plaintiff telephoned the State Department of Education who advised her to find another individual with the appropriate authority to sign the application. Plaintiff spoke with Larry Dodge, EWC's Vice President, who indicated that he would be talking to Mason over the phone and that he would find out who else could sign the application. When the plaintiff was released from the hospital, she received a copy of the grant application which had been signed by Mr. Billy Bates, her immediate supervisor. In the interest of caution, the plaintiff called Dodge to verify that Bates had the authority to sign the application, and she was told that he was in fact authorized.

Mason claimed that it was a breach of procedure for him not to review personally the application, even though he allegedly had knowledge of the circumstances surrounding this particular application process. Moreover, the plaintiff later learned that in a similar situation, another employee received a blank application form to be filled in at a later time. That employee felt no repercussions for his or her actions, but it was used against the plaintiff to suspend her. Finally, neither Bates or Dodge were reprimanded for their actions in advising the plaintiff as to the procedures that she ultimately followed.

The next basis for the suspension involved an incident with Jane Sullivan, the wife of the governor of the State of Wyoming. The plaintiff was a close personal friend of Mrs. Sullivan's and she personally invited her to attend a community-oriented program entitled "Listening to Wyoming Families." The program was essentially a community meeting designed to allow parents to express their concerns and needs. The plaintiff placed flyers promoting the event in the mailboxes of all EWC faculty members including defendant Mason. Defendant Mason contends that the plaintiff's actions were in some way a violation of protocol because he did not receive a personalized invitation to attend the event.

Finally, Mason relied on an incident involving an individual named Dr. Gonzales, who had been invited to speak at a regional meeting held at EWC. The subject of his address related to the adapting university practices to multi-cultural and non-traditional student backgrounds. After his lecture, the plaintiff was introduced to Dr. Gonzales and she invited him to come and see the Adult Re–Entry Center as an example of her work in the areas that Dr. Gonzales had spoken. In his letter of suspension, defendant Mason indicated that the plaintiff had interrupted some form of "meeting" with Dr. Gonzales, even though it appears that no meeting had taken place. In addition, Mason's letter of suspension chastised the plaintiff for not advocating the "official position" of EWC during her conversation with Dr. Gonzales.

Plaintiff thereafter initiated this suit on November 10, 1993, pursuant to 42 U.S.C. § 1983 (1988). She named Roy Mason as the defendant, in both his individual capacity and his official capacity as President of EWC,[3] and sought both damages and prospective injunctive relief. Her complaint alleges that the actions of defendant Mason violated various constitutional rights, including due process and the First Amendment. Essentially, she alleges that the decision to suspend her was a pretext to retaliate against her because she expressed views not held by Mason on important public and social matters.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (1988) and any potential objection to the exercise of personal jurisdiction over the defendants or to venue in this forum are hereby waived pursuant to Rule 12(h)(1). The matter is presently be-

---

**3.** The official capacity suit against Mason is, for all relevant purposes, a suit against EWC. *See Hafer v. Melo*, 502 U.S. 21, ——, 112 S.Ct. 358, 361, 116 L.Ed.2d 301 (1991) ("[t]he real party in interest in an official-capacity suit is the governmental entity and not the named official ...").

fore the Court on Mason's motions in both of his named capacities. Because both parties have relied, to some extent, on matters outside of the pleadings, the Court will, pursuant to Rule 12(b), treat these motions as motions for summary judgment.

A. *Civil Rights Litigation Under § 1983*

In order to address the merits of these motions, the Court finds it necessary to review certain aspects on the law regarding § 1983 suits.

### 1. *An Overview*

Section 1983 provides, in relevant part, that:

> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (1988). Thus, it is apparent that in order to establish a *prima facie* violation of this statute, the plaintiff must allege that he was subjected to the deprivation of a federally protected right by the defendant, and that the defendant's actions were taken "under color of state law." *See, e.g., West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 2254, 101 L.Ed.2d 40 (1988); *Flagg Bros. Inc. v. Brooks,* 436 U.S. 149, 155, 98 S.Ct. 1729, 1732, 56 L.Ed.2d 185 (1978).

It is clear that the plaintiff has met this minimal threshold requirement. She alleges that the defendant violated her First Amendment, due process and equal protection rights, all of which are federally protected rights under the Constitution. Moreover, the defendant admitted in his answer that his actions were taken "under color of state law."

A plaintiff may sue a defendant in either his individual capacity, his official capacity, or, as is the case here, in both capacities. While the distinction between these two types of suits had not always been readily apparent, *see Brandon v. Holt,* 469 U.S. 464, 471–73, 105 S.Ct. 873, 877–79, 83 L.Ed.2d 878

(1985), the Supreme Court has recently reaffirmed that suits in both capacities are indeed viable. *See, e.g., Hafer,* 502 U.S. at ——–——, 112 S.Ct. at 361–62 (citations omitted).

The capacity in which a defendant is sued is an important fact. In *Kentucky v. Graham,* 473 U.S. 159, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985), the Supreme Court succinctly summarized the difference between an individual, or personal-capacity suit and an official-capacity suit. The Court stated that:

> [p]ersonal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law ... [o]fficial-capacity suits, in contrast, generally represent only another way of pleading an action against an entity of which an officer is an agent.... an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

*See id.* at 165–66, 105 S.Ct. at 3105; *see also Brandon,* 469 U.S. at 471–72, 105 S.Ct. at 877–78.

Thus, an individual-capacity suit simply requires proof of a deprivation of a federally protected right by an individual acting under color of state law. *See Graham,* 473 U.S. at 166, 105 S.Ct. at 3105. In order to prevail in an official-capacity suit, however, the plaintiff must prove those two elements *and* an additional element. That additional burden requires the plaintiff to demonstrate that the governmental entity itself was the "moving force" behind the deprivation such that it would be proper to impose liability on the municipality itself. *See Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981) (quoting *Monell v. New York City Dep't of Social Svces.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978)).

Thus, because an official-capacity suit seeks to impose liability against the municipality itself, it follows that the plaintiff must show that the official's actions were undertaken pursuant to some official act which is attributable to the municipality. As the *Monell* Court stated:

[l]ocal governing bodies ... can be sued directly under § 1983 ... where, as here, the action that is alleged to be unconstitutional implements or " executes a *policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers* ... Moreover ... local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.

*Id.* at 690–91, 98 S.Ct. at 2035–36 (emphasis added); *see also Oklahoma v. Tuttle*, 471 U.S. 808, 817–18, 105 S.Ct. 2427, 2432–33, 85 L.Ed.2d 791 (1985) (stating that municipal policy or custom must have played a part in the alleged deprivation of a protected interest in order to find liability in an official capacity suit). There must therefore be proof that the acts in question were inflicted by a government's "lawmakers or by those whose edicts or acts may fairly be said to represent official policy[.]" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121–22, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988) (citing *Monell*, 436 U.S. at 694, 98 S.Ct. at 2037).

The defense or defenses applicable to a § 1983 suit are contingent on the nature of the action. In *Graham*, the Supreme Court expressly held that the defenses available in an individual capacity suit are the "personal immunity defenses, such as objectively reasonable reliance on existing law." *Graham*, 473 U.S. at 166–67, 105 S.Ct. at 3105 (citing, *inter alia, Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). The Court, citing *Owen v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), held that these defenses would be "unavailable" in an official capacity suit, stating:

[t]he only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, qua entity, may possess, such as the Eleventh Amendment.

*Graham*, 473 U.S. at 167, 105 S.Ct. at 3106. With these principles in mind, the Court will now analyze the merits of the pending motions.

### 2. *Individual Capacity Liability*

Mason has asserted qualified immunity as a defense to the individual capacity suit.

### a. *The Doctrine of Qualified Immunity*

#### i. *General Principles*

◼ The doctrine of qualified immunity confers government officials with immunity from damages suits for their discretionary acts undertaken in their capacity as government employees. *See Mitchell v. Forsyth*, 472 U.S. 511, 526–27, 105 S.Ct. 2806, 2815–16, 86 L.Ed.2d 411 (1985); *see also Antoine v. Byers & Anderson, Inc.*, —— U.S. ——, ——–——, 113 S.Ct. 2167, 2171–72, 124 L.Ed.2d 391 (1993); *Pueblo Neighborhood Health Centers v. Losavio*, 847 F.2d 642, 644 (10th Cir.1988). The classic formulation of the doctrine provides:

[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), *quoted in Rozek v. Topolnicki*, 865 F.2d 1154, 1157 (10th Cir.1989).

The doctrine of qualified immunity serves the salutary purpose of "protecting officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Butz v. Economou*, 438 U.S. 478, 506, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *Buckley v. Fitzsimmons*, 509 U.S. ——, ——, 113 S.Ct. 2606, 2613, 125 L.Ed.2d 209 (1993); *see also Sawyer v. County of Creek*, 908 F.2d 663, 665–67 (10th Cir.1990). The defense is both an immunity from suit as well as an immunity from liability. *See Mitchell*, 472 U.S. at 526, 105 S.Ct. at 2815. Moreover, because the immunity from suit component of this defense would effectively be lost if this motion is denied and the case is erroneously permitted to go to trial, *Mitchell* held that an order denying a motion for

qualified immunity is "[a]n appealable interlocutory decision" under the collateral order doctrine enunciated in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949).

█ Resolution of a claim of qualified immunity presents the following issues: (1) what is the specific right alleged to have been violated; (2) was this right "clearly established" at the time that the right was alleged to have been violated; and if so, (3) would a reasonable person in the defendant's position have known that what he did would violate that specific right. *See Pritchett v. Alford,* 973 F.2d 307, 312 (4th Cir.1992); *see also Applewhite v. United States Air Force,* 995 F.2d 997, 1000 (10th Cir.1993). The first two inquiries are pure questions of law, and a district court "cannot avoid th[ose] question[s] by framing [them] as ... factual issue[s]." *Losavio,* 847 F.2d at 646, *quoted in Dixon v. Richer,* 922 F.2d 1456, 1460 (10th Cir.1991). Thus, as the Second Circuit noted:

> [d]isposition by summary judgment is ordinarily appropriate when the qualified immunity defense is based on a showing that it was not clear at the time of the official acts that the interest asserted by the plaintiff was protected by federal law. Summary judgment may also be available when the defendant's premise is that even if the contours of the plaintiff's federal rights and the official's permissible actions were clearly delineated at the time of the acts complained of, ... it was objectively reasonable for [the official] to believe that his acts did not violate those rights.

*Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir.1993) (citations and internal quotations omitted).

█ The fact that the affirmative defense [4] of qualified immunity is asserted at the summary judgment phase of the litigation, as it often is, does not alter the traditional burdens of proof that apply to a motion for summary judgment, *e.g., Halperin v. Kissinger,* 807 F.2d 180, 188–89 (D.C.Cir.1986) (Scalia, Circuit Justice),[5] *aff'd by an equally divided Court,* 452 U.S. 713, 101 S.Ct. 3132, 69 L.Ed.2d 367 (1981), subject to one caveat: once the defendant pleads qualified immunity, the plaintiff must establish that the defendant's actions violated clearly established rights. *See Applewhite,* 995 F.2d at 1000 (citing *Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991)); *Powell v. Gallentine,* 992 F.2d 1088, 1090 (10th Cir.1993); *Woodward v. City of Worland,* 977 F.2d 1392, 1396–97 (10th Cir.1992).

If this showing is made, then the normal summary judgment analysis applies. The moving party has the initial burden of establishing that there are no genuine issues of material fact on the question of whether the defendant's actions were objectively reasonable. *See Powell v. Mikulecky,* 891 F.2d 1454, 1457 (10th Cir.1989) (citing *Losavio,* 847 F.2d at 645). While this premise:

> has its principal focus on the particular facts of the case[, i]t may nonetheless permit the granting of summary judgment to the defendants if they adduce sufficient uncontroverted facts that, even looking at the evidence in the light most favorable to the plaintiff[ ] and drawing all inferences favorable to the plaintiff[ ], *no reasonable jury could conclude that it was objectively unreasonable for then defendants to believe that they were acting in a fashion that did not violate an established federally protected right.*

*Ying Jing Gan,* 996 F.2d at 532 (citing *Hurlman v. Rice,* 927 F.2d 74, 78 (2d Cir.1991)

---

4. While this defense is in fact an affirmative defense, *see Harlow,* 457 U.S. at 815, 102 S.Ct. at 2736; *see also Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980), the plaintiff's complaint cannot be subjected to any type of "heightened pleading requirement" so as to defeat the defendant's anticipated claim of qualified immunity. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* —— U.S. ——, ——–——, 113 S.Ct. 1160, 1162–63, 122 L.Ed.2d 517 (1993).

*Leatherman* effectively overrules this aspect of *Sawyer,* 908 F.2d at 665–67, where the Tenth Circuit seemingly endorsed a heightened pleading requirement.

5. Justice Scalia was confirmed as a justice of the Supreme Court after argument but prior to the issuance of the written opinion. *Id.* at 181 n. *.

(emphasis added)); *see also Martin v. Malhoyt,* 830 F.2d 237, 253–54 (D.C.Cir.1987) (R. Ginsburg, J.). It is apparent that at this stage of the qualified immunity analysis, unless the defendant can establish that no reasonable jury could find that his actions were objectively unreasonable, the motion for summary judgment based on qualified immunity must be denied.

At this juncture, it is important to understand the nature of the qualified immunity defense. It is, undoubtedly, an immunity from suit itself. *See Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815, *quoted in Losavio,* 847 F.2d at 644. In *Harlow,* the Supreme Court recognized that damages suits against government officials are costly not only for the defendant himself, but for society as a whole. Those societal costs include "the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office." *Harlow,* 457 U.S. at 814, 102 S.Ct. at 2736, *quoted in Post v. City of Ft. Lauderdale,* 7 F.3d 1552, 1556 (11th Cir. 1993). The doctrine clearly embodies a preference in favor of allowing public officials to act "with independence and without fear of consequences[,]" *Harlow,* 457 U.S. at 819, 102 S.Ct. at 2739 (citations omitted), subject to the limitation that the official's actions not violate any clearly established law of which he or she should reasonably have known.

As a result, the Supreme Court has repeatedly "stressed the importance of resolving immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant,* 502 U.S. 224, ——, 112 S.Ct. 534, 536, 116 L.Ed.2d 589 (1991) *(per curiam )* (citing cases). While qualified immunity is an immunity from suit, this necessarily includes immunity from liability on the merits as well. If the suit cannot proceed, then *a fortiori* the defendant cannot be liable for damages on the merits.

Thus, the procedural question arises as to what happens if there is a genuine issue of material fact on the issue of qualified immunity, specifically, whether the defendant's ac-

tions were objectively reasonable, such that summary judgment is precluded. Since the district court cannot resolve this factual issue, is it left for the jury to decide? If so, then how can this be reconciled with the notion that qualified immunity is an immunity from suit itself?

The Supreme Court recently addressed the former question. In *Hunter,* the Court summarily reversed the Ninth Circuit's holding that the issue of the defendant's reasonableness for purposes of qualified immunity "[was] a question for the trier of fact[.]" *Hunter,* 502 U.S. at —— ——, 112 S.Ct. at 536–37 (citing *Bryant v. United States Treasury Dep't, Secret Service,* 903 F.2d 717, 721 (9th Cir.1990)). The next sentence stated that the Ninth Circuit's holding was an erroneous statement of law because "[i]t routinely places the question of immunity in the hands of the jury. Immunity *ordinarily* should be decided *by the court* long before trial." *Hunter,* 502 U.S. at ——, 112 S.Ct. at 537 (citing *Mitchell,* 472 U.S. at 527–29, 105 S.Ct. at 2816–17) (emphases added), *quoted in Chapman v. Nichols,* 989 F.2d 393, 398 (10th Cir.1993).

This statement, however, leaves several important questions unanswered. First, while it rejects the notion that the question of objective legal reasonableness is a factual issue for the jury ("decided by the court"), it is clear that the traditional summary judgment standards are fully applicable. There is, therefore, an inconsistency, in that it appears to be a question for the Court to decide, yet the Supreme Court's trilogy of 1986 summary judgment decisions—*Celotex, Liberty Lobby* and *Matsushita* [6]—make it clear that the district court's role is limited to *identifying* factual issues and not resolving them. Second, it is unclear what the Court meant by the use of the modifier "ordinarily." This seems to imply that in most cases, the issue should be decided by the court; it does not, however, speak to the "non-ordinary" case.

█ It appears that the way to reconcile these seemingly conflicting mandates is to

---

6. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Ind. Co. v. Zenith Radio,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

understand that although a genuine issue of material fact precludes the entry of qualified immunity *prior to* trial, it does not prevent the defendant from reasserting the defense *at* trial. In other words, while a factual issue defeats the "immunity from suit" component of the qualified immunity, the defendant will still retain the right to renew this motion at trial in an effort to avail himself of the "immunity from liability" component of the defense. This seems to be the conclusion reached by the Tenth Circuit's recent decision in *Guffey v. Wyatt*, 18 F.3d 869 (10th Cir.1994).

In *Guffey*, the magistrate judge found that genuine issues of material fact precluded entry of summary judgment for the defendant on his claim of qualified immunity. The magistrate went on to state that he would not permit the defendant to reassert this defense at trial. *Id.* at 873. The Tenth Circuit expressly found that this ruling "overlook[s] the fact that the doctrine of qualified immunity shields a defendant both from trial *and* from damages." *Id.* (emphasis in original).

In support, the Court cited a Seventh Circuit decision for the proposition that "the right not to pay damages and the right to avoid trial are *distinct aspects* of immunity." *Id.* (emphasis added) (citing *Apostol v. Gallion*, 870 F.2d 1335, 1339 (7th Cir.1989)). Thus, while a genuine issue of material fact will mandate the denial of a defendant's immunity *from suit*, this "does not mean that the officers cannot reassert their qualified immunity claims at and after trial when the factual disputes have been resolved." *Dixon*, 922 F.2d at 1463. In other words, the defendant still retains the right to reassert his immunity *from liability* at trial as to the merits of the claims. In *Africa v. City of*

*Philadelphia*, 809 F.Supp. 375 (E.D.Pa.1992), the district court wrote:

> for those defendants to whom [there is a genuine issue of material fact regarding the reasonableness component,] summary judgment on qualified immunity grounds should be denied (*though it may be raised anew once facts are further developed and explored at trial* ).

*Id.* at 382 (emphasis added). Of course, the trial court's decision whether to find that the defendant was immune will necessarily depend on the evidence adduced at trial regarding the reasonableness of the defendant's conduct.

█ The issue of *how* this defense should be reasserted "at and after trial" was not addressed in any of the cases discussed above. Nonetheless, because the answers to several related issues are clear, this Court can infer the proper method for raising this defense during subsequent proceedings. First, the defendant bears the burden of establishing that his actions were reasonable, by a preponderance of the evidence, because qualified immunity is an affirmative defense under *Harlow* and *Gomez*. *See Harlow*, 457 U.S. at 815, 102 S.Ct. at 2736; *Gomez*, 446 U.S. at 640, 100 S.Ct. at 1923. Second, while the ultimate issue of whether the defendant is entitled to qualified immunity is a legal question, it appears that the underlying factual question as to the reasonableness component is a question for the trier of fact— since there was a genuine issue of material fact relating to this question in the first place. Thus, in order to reassert this claim "at" trial, the Court would submit an interrogatory to the jury so that it may resolve this factual issue. *See Dixon*, 922 F.2d at 1463 (noting that qualified immunity may be reasserted at and after trial "when the factual disputes have been resolved"), *quoted in Guffey*, 18 F.3d at 873.[7] The Court can then

---

7. The cases presents a difficult conundrum. *Hunter* can arguably be read as rejecting the position that this issue is one for the trier of fact. *Hunter*, 502 U.S. at ——–——, 112 S.Ct. at 536–37. In contrast, traditional summary judgment principles command that a genuine issue of material fact be resolved by the trier of fact. Something has to give.

It appears to this Court that *Hunter* must be distinguishable since it only spoke to the general

rule that qualified immunity issues should "ordinarily" be resolved before trial. *Hunter*, 502 U.S. at ——, 112 S.Ct. at 537. It did not, in other words, address the situation where summary judgment could not be granted because there was a genuine issue of material fact, the situation presented in the case at bar. Thus, while the jury can speak to the issue of the reasonableness of the defendant's actions, the

determine the legal issue of qualified immunity based on the jury's answer to this interrogatory. The interrogatory would simply ask the jury whether the defendant has proven by a preponderance of the evidence that his actions were reasonable under the particular facts of the case at hand. The Court believes that this interpretation harmonizes *Hunter, Guffey* and *Dixon* with *Celotex, Liberty Lobby* and *Matsushita.*[8]

### ii. Clearly Established Law

█ The determination of whether the actions or inactions of the defendants violated any "clearly established statutory or constitutional rights" is a question of law which must be decided by more than simple reference to "generalized legal principles." *Medina v. City and County of Denver*, 960 F.2d 1493, 1497 (10th Cir.1992). In order for a right to be "clearly established" under *Harlow* and its progeny, thereby placing the defendant on notice that his or her conduct might be actionable under then-existing law, the plaintiff bears the burden, *see Lutz v. Weld County Sch. Dist.*, 784 F.2d 340, 342–43 (10th Cir.1986), of establishing that the contours of the right were "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *see also Dixon*, 922 F.2d at 1460. In other words, "in light of the pre-existing law[,] the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039, *quoted in Applewhite*, 995 F.2d at 1000.

█ Although the plaintiff "must demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited[,]" *Hannula v. City*

*of Lakewood*, 907 F.2d 129, 131 (10th Cir. 1990), the requisite degree of correlation should not be judged by too strict of a standard. The plaintiff need not show that there is "precise[ ] factual correspondence between previous cases and the case at bar." *Calhoun*, 982 F.2d at 1475 (citing *Garcia v. Miera*, 817 F.2d 650, 657 (10th Cir.1987), cert. denied, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988)). There must simply be "some" degree of factual similarity shown. "[T]his standard requires officials to know well developed legal principles and to relate and apply them to analogous factual situations." *Calhoun*, 982 F.2d at 1475 (citation omitted).

█ The inquiry must also focus on the developmental stage of the law. As the Tenth Circuit stated, "in order for the law to be clearly established, there must be a Supreme Court decision on point, or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina*, 960 F.2d at 1498 (citing *Stewart v. Donges*, 915 F.2d 572, 582–83 & n. 14 (10th Cir.1990)). "We consider the law to be 'clearly established' when it is *well-developed enough* to inform [a] reasonable official that his conduct violates the law." *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir.1992) (emphasis added).

### iii. Objective Legal Reasonableness

█ The final question is whether a reasonable person in the defendants' position would have understood that his or her conduct violated a clearly established right under the facts and circumstances known *at that time*. *See Anderson*, 483 U.S. at 639–42, 107 S.Ct. at 3038–40 (emphasis added); *see also Sawyer*, 908 F.2d at 666; *Hilliard v.*

---

Court will eventually determine the ultimate issue of immunity.

Moreover, the notion that this issue can be raised "after" trial would seem to allow a defendant, in the proper case, to assert that the jury's finding on this issue was erroneous as a matter of law by way of a post-trial motion for judgment as a matter of law under Rule 50(b).

8. This Court echoes the sentiments of Justice Kennedy's dissenting opinion in *Hunter*, where he indicated that the tension between traditional

summary judgment standards in the qualified immunity context needs more careful review from the High Court. *See Hunter*, 502 U.S. at ——, 112 S.Ct. at 540 (Kennedy, J., dissenting). Justice Kennedy goes on to point out that the summary reversal in *Hunter* does little to resolve conclusively this issue and that the individual opinions of the justices themselves may in fact have created, rather than resolved, this tension. *Id.; see also Calhoun v. Gaines*, 982 F.2d 1470, 1475 n. 4 (10th Cir.1992) (calling for "a fresh look" at this area of the law).

*City and County of Denver,* 930 F.2d 1516, 1521 (10th Cir.1991) (emphasizing that the contours must have been well-delineated at the time of the conduct). As the Tenth Circuit stated in *Coen v. Runner,* 854 F.2d 374 (10th Cir.1988), the issue is whether the defendant's actions "were objectively reasonable *in light of the law and the information he or she possessed at the time.*" *Id.* at 377 (citing *DeVargas v. Mason & Hanger–Silas Co.,* 844 F.2d 714, 719 (10th Cir.1988) (citation omitted)).

### b. *Application in this Case*

In the present case, the defendant has pled qualified immunity as a defense to the individual capacity aspect of this suit. Under the controlling case law, the burden now shifts to the plaintiff to identify the clearly established law that she alleges has been violated. *See Applewhite,* 995 F.2d at 1000 (citing cases).

The plaintiff claims that the defendant's actions violated her constitutional rights to procedural due process, equal protection, freedom of association and freedom of speech. With respect to her due process claims, she alleges that the defendant deprived her of a protected property interest without due process of law in that the defendant failed to provide her with a pre-suspension hearing and that her post-suspension hearing was not decided by an impartial decisionmaker. In addition, she claims that the publication of the accusations of her alleged insubordination in a newspaper deprived her of a protected liberty interest. With respect to her First Amendment claims, she alleges that her suspension was in retaliation for her exercise of her First Amendment rights by speaking on matters of public interest, and that she was deprived of her right to freely associate with the particular organizations and individuals with whom she chose to associate. She further claims that she was treated "differently" from other teachers and that she was subjected to harsher treatment in violation of the equal protection clause of the Fourteenth Amendment. Finally, she alleges that she was treated in a less favorable manner based on her gender in violation of

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (1988).

#### i. *Due Process*

Plaintiff's procedural due process claims alleges that the defendant deprived her of her "property" without due process of law in that she claims that she was denied a pre-suspension hearing and that her post-suspension hearing was deficient because the board was not impartial. In addition, she alleges that the defendant's actions in accusing her of insubordination in a community newspaper constituted a deprivation of a protected liberty interest. The Court will address these claims in turn.

The due process clause of the Fourteenth Amendment does not create an absolute bar prohibiting a state from effectuating any and all "deprivations" of a individual's "life, liberty or property." Rather, it protects against a deprivation, that is, a "remov[al] or significant[ ] alter[ation]" of these interests, *see Paul v. Davis,* 424 U.S. 693, 711, 96 S.Ct. 1155, 1165, 47 L.Ed.2d 405 (1976), "without due process of law." U.S. CONST. amend. 14; *see also Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 2694, 61 L.Ed.2d 433 (1979).

The analysis for determining whether there has been a violation of due process involves two distinct inquiries. First, the Court must determine whether the individual has a protected interest, which usually takes the form of a liberty or property interest. "[Liberty and property] interests attain … constitutional status by virtue of the fact that they have been initially recognized and protected by state law[.]" *Paul,* 424 U.S. at 710, 96 S.Ct. at 1165. "[If] it is determined that the due process clause applies, 'the question remains what process is due.'" *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (citing *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972)). This second prong of the analysis depends on the three-part balancing test adopted in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), which focuses on the private and public interests at stake as well as the degree of accuracy-

enhancement that additional process would provide under the circumstances. *Id.* at 335, 96 S.Ct. at 903.

◼ Thus, the threshold question is whether the plaintiff has a protected property interest. It is useful to identify the parameters of property interests in the employment context. First, as one court succinctly noted:

> [w]hen called upon to decide the question of whether an employee possesses a state law property interest in employment, [the courts] have generally resolved the matter by providing a simple yes or no answer based on whether the employment is at-will or for cause.

*Listenbee v. City of Milwaukee,* 976 F.2d 348, 351 (7th Cir.1992). This rationale stems from the notion that the existence of a property interest in employment depends upon whether the employee had a "legitimate claim of entitlement" to the employment, rather than an "abstract need or desire" for, or "unilateral expectation" of continued employment. *See Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). It follows *a fortiori* that an at-will employee who was terminated would have no legitimate claim of entitlement to his or her employment.

◼ This argument, however, addresses a claim of a deprivation of a property interest where the interest alleged to have been violated was the employee's interest in *continued* employment. The defendant does not dispute that the plaintiff in this case was a continuing contract teacher, who was terminable only for good cause under Wyoming law. *See* Wyo.Stat. §§ 21–7–102(a)(ii) –104 (1992); *see also Board of Trustees v. Spiegel,* 549 P.2d 1161 (Wyo.1976); *O'Melia v. Sweetwater County School Dist. No. 1,* 497 P.2d 540 (Wyo.1972); *Monahan v. Board of Trustees,* 486 P.2d 235 (Wyo.1971). As a result, the plaintiff would certainly have a protected property interest if the defendant had sought to deprive her of her right to continued employment. Indeed, this conclusion is com-pelled by *Loudermill. See Loudermill,* 470 U.S. at 542–44, 105 S.Ct. at 1493–95 (finding that a tenured teacher has property interest in her continued employment).

Relying on *Listenbee,* however, the defendant argues that the plaintiff was not terminated here but was suspended with pay for an eleven day period, and that a temporary suspension with pay [9] does not create a property interest in *continuous* employment. Although *Listenbee* is distinguishable on the facts since a particular state statute was at issue there, a fact not present in this case, the Tenth Circuit's decision in *Pitts v. Board of Educ. of U.S.D. 305, Salina, Kansas,* 869 F.2d 555 (10th Cir.1989) expressly held that a two-day suspension with pay did not deprive the plaintiff of a measurable property interest. *Id.* at 556 (citations omitted). Because the Court finds no meaningful distinction between the two-day suspension in *Pitts* and the eleven day suspension here, the plaintiff's due process argument based on a property interest is foreclosed by this authoritative precedent.

◼ As far as the plaintiff's liberty interest claim, she alleges that Mason's actions in accusing her of insubordination, which were published in community newspapers, deprived her of a protected liberty interest.

> Liberty interests are broader and more difficult to define than property interests. 'While property exists in concrete entitlements secured by independent sources of law, liberty interests cannot be so easily characterized.'

*Jensen v. Redevelopment Agency of Sandy City,* 998 F.2d 1550, 1558 (10th Cir.1993) (citing *Bank of Jackson County v. Cherry,* 980 F.2d 1362, 1367 (11th Cir.1993)). At the extreme, however, it is clear that "[d]amage to one's reputation alone ... is not enough to implicate due process protections." *Jensen,* 998 F.2d at 1558 (citing *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160; *Wulf v. City of Wichita,* 883 F.2d 842, 869 (10th Cir.1989); *McGhee v. Draper,* 639 F.2d 639, 643 (10th

---

9. *Hill v. Ibarra,* 954 F.2d 1516 (10th Cir.1992) recognized that an individual does, in some circumstances, possess a property interest in money. *Id.* at 1524. Because the plaintiff in this case was suspended with pay, her alleged property interest cannot be a monetary interest. *See Listenbee,* 976 F.2d at 353.

Cir.1981) ("[S]tigmatization or reputational damage alone, no matter how egregious, is not sufficient to support a § 1983 cause of action.")); *see also Botefur v. City of Eagle Point, Oregon,* 7 F.3d 152, 158 (9th Cir.1993); *Sims v. City of New London,* 738 F.Supp. 638, 645–47 (D.Conn.1990).

*Paul* explicitly rejected the notion that stigma alone could state a claim for a deprivation of liberty. This holding was grounded, in part, in the Court's reluctance to convert the Fourteenth Amendment into "a font of tort law," *Paul,* 424 U.S. at 701, 96 S.Ct. at 1160, which, in this context, would supersede the state's traditional authority to permit an individual to redress this type of claim under state defamation law. *See, e.g., Fleming v. Department of Public Safety,* 837 F.2d 401, 409 (9th Cir.) (noting that an action for damage to reputation "lies ... in the tort of defamation, and not in section 1983"), *cert. denied,* 488 U.S. 889, 109 S.Ct. 222, 102 L.Ed.2d 212 (1988), *quoted in Botefur,* 7 F.3d at 158.

*Paul* did find that under certain circumstances, a liberty interest could be implicated if, in addition to stigmatic injury, "a right or status previously recognized by state law was distinctly altered or extinguished." *Paul,* 424 U.S. at 711, 96 S.Ct. at 1165. Lower courts routinely refer to this as the so-called "stigma plus" test. *E.g., Sims,* 738 F.Supp. at 646. The problem is that "the case law is not altogether clear just what the 'plus' requires." *Id.* (footnote omitted).

 Regardless of the disparity in the case law, the Tenth Circuit's most recent pronouncement in this area summarized the applicable law which binds this Court. The court wrote:

> [t]o be successful on their claim for deprivation of a liberty interest in their reputations, plaintiffs must allege and establish that there was information published that was false and stigmatizing. *Wulf,* 883 F.2d at 869. Moreover, 'it is necessary that the alleged stigmatization be entangled with some further interest....' *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978,

982 (10th Cir.1991). For example, plaintiffs must allege and present evidence of present harm to established business relationships. *Phelps v. Wichita Eagle–Beacon,* 886 F.2d 1262, 1268 (10th Cir.1989) (discussing *Corbitt v. Andersen,* 778 F.2d 1471 (10th Cir.1985)). Damage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest. *Id.* 886 F.2d at 1269 (citing *Setliff v. Memorial Hosp. of Sheridan County,* 850 F.2d 1384, 1397 n. 18 (10th Cir. 1988)).

*Jensen,* 998 F.2d at 1558. Thus, there must be proof that the information that was published was: (1) false; (2) stigmatizing; and (3) that some further interest was adversely affected. In addition, an employer is only required to provide an employee with notice and a hearing (so that the employee may have an opportunity to clear his or her name) when the information alleged to have been false and which created the stigma was disseminated "in connection with his termination[.]" *Hicks v. City of Watonga, Oklahoma,* 942 F.2d 737, 745–46 (10th Cir.1991), *quoting Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977).

 Applying these principles to the case at bar, the Court finds that the allegations in the complaint that the defendant's statements "imputed incompetency and inefficiency in Plaintiff's professional responsibilities," and which contain allegations of insubordination are not "stigmatizing" as a matter of law since they do not impute "dishonesty or immorality." *See, e.g., Hicks,* 942 F.2d at 746 (citing *Melton v. City of Oklahoma City,* 928 F.2d 920, 927 (10th Cir.1991)). Allegations of neglect of duties and insubordination are equally insufficient. *See Hicks,* 942 F.2d at 746 (citing *Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir.1988)). Therefore, it is clear that the defendant's motion for summary judgment as to the liberty interest claim must be granted since the plaintiff's allegations of stigmatization are legally insufficient under the controlling precedents of the Tenth Circuit.[10]

10. The plaintiff has also asserted a pendent state law claim for defamation, which has some overlap to her liberty interest claim. For reasons given below, the Court finds that the defendant's arguments with respect to the defamation claim are unpersuasive and that his motion for sum-

### ii. *Freedom of Speech*

*Powell v. Gallentine* delineates the appropriate inquiry for determining whether a public employee was treated less favorably because he or she exercised their "constitutionally protected interest in freedom of expression." *Gallentine*, 992 F.2d at 1090 (citing *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983)).

The court's inquiry in a First Amendment case covers four steps. *Melton v. City of Oklahoma City*, 879 F.2d 706, 713 (10th Cir.1989), *modified on other grounds*, 928 F.2d 920 (10th Cir.) (en banc), *cert. denied*, [— U.S. ——, 112 S.Ct. 296, 116 L.Ed.2d 241 (1991)]. First, the court must determine whether the 'employee's speech touches upon a matter of public concern.' *Id.* (citing *Connick*, 461 U.S. [at 143, 103 S.Ct. at 1688]). If the speech involved a matter of public concern, the court must then balance 'the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public.' *Id.* (citing *Pickering v. Board of Educ.*, 391 U.S. 563, 568 [88 S.Ct. 1731, 1734, 20 L.Ed.2d 811] (1968)). These first two steps involve questions of law for the court. *Id.* Third, assuming the *Pickering* balance test tipped in favor of the plaintiff, he or she must show that the protected speech was a 'motivating factor' in the employer's detrimental employment decision. *Id.* (quoting *Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 287 [97 S.Ct. 568, 576, 50 L.Ed.2d 471] (1977). Finally, 'if the plaintiff makes this showing, the burden shifts to the employer to show by a preponderance of the evidence that it would have reached the same decision in the absence of the protected activity.' *Id.* The third and fourth steps involve questions of fact for the jury. *Id.*

*Gallentine*, 992 F.2d at 1090; *see also Wren v. Spurlock*, 798 F.2d 1313, 1318 (10th Cir. 1986), *cert. denied*, 479 U.S. 1085, 107 S.Ct. 1287, 94 L.Ed.2d 145 (1987).

There are numerous principles enunciated by the Supreme Court and the Tenth Circuit that govern these inquiries. With respect to the question of whether the speech involved a matter of "public concern," this requirement stems from a recognition that:

> if the employee's speech does not involve a matter of public concern, then it is unnecessary for us to scrutinize the reasons for [the employer's adverse employment decision]. When employee expression cannot be fairly considered as [involving a matter of public concern,] government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment.

*Flanagan v. Munger*, 890 F.2d 1557, 1562 n. 4 (10th Cir.1989) (quoting *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689).

 The analysis of this threshold issue "must be determined by the content, form, and context of a given statement[.]" *Rankin v. McPherson*, 483 U.S. 378, 384–85, 107 S.Ct. 2891, 2897, 97 L.Ed.2d 315 (1987) (citing *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689). In addition, the speech must "relate to a topic of political, social or other concern to the community." *McEvoy v. Shoemaker*, 882 F.2d 463, 465–66 (10th Cir.1989); *see also Ware v. Unified Sch. Dist. 492, Butler County, Kansas*, 881 F.2d 906, 909 (10th Cir.1989); *Koch v. City of Hutchinson*, 847 F.2d 1436, 1444–45 (10th Cir.1988) (*en banc*).

"The inappropriate or controversial character of a statement is *irrelevant* to the question [of] whether it deals with a matter of public concern." *Rankin*, 483 U.S. at 387, 107 S.Ct. at 2898 (emphasis added). This is especially true since "the focus is on the motive of the speaker, '*i.e.*, whether the speech *was calculated* to disclose misconduct or dealt with only personal disputes and grievances with no relevance to the public interests.'" *McEvoy*, 882 F.2d at 466 (citing *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1988) (*per curiam*) (emphasis in *Conaway*)). "Just as erroneous statements must be protected to give freedom of expression the breathing space it needs to survive, so statements criticizing public policy and the implementation of it must be similarly protected." *Bond v. Floyd*, 385 U.S. 116, 136, 87

mary judgment as to this claim must also be denied.

S.Ct. 339, 349, 17 L.Ed.2d 235 (1966). With these principles in mind, the Court must now determine whether the plaintiff's speech involved a matter of public concern. It is readily apparent that it did.

■ This case presents what the Tenth Circuit has described as the "typical *Pickering/Connick* fact pattern" in that it involves an employee who "has been terminated *or disciplined* by a public employer for critical and allegedly disruptive comments made about work." *Flanagan,* 890 F.2d at 1562 (footnote omitted).[11]

The defendant's argument that this speech did not involve a matter of public concern is disingenuous. He argues that the act of suspending the plaintiff is a private, personnel matter does not constitute a matter of public concern. This focus is misdirected. The issue is whether this suspension was a retaliatory measure that was the culmination of the plaintiff's prior exercise of her First Amendment rights. Thus, the inquiry must necessarily focus on those statements to determine if the *speech* at issue implicated a matter of public concern, a conclusion that is inescapable in this case.

The plaintiff's speech was directed to the public at large. She attempted to raise public awareness relating to the need for special assistance on behalf of the disadvantaged and minority students with whom she worked. She also spoke out on the consequences of the decision to close the Adult Re–Entry Center as well as the situation surrounding Mary McBroom's termination. She also led the efforts to obtain a vote of no-confidence as to defendant Mason which implicated broader concerns that simply private gain, concerns involving the possible misrepresentation of his doctoral degree, his lack of leadership vis-à-vis the plaintiff's educational programs and the corresponding decline in student enrollment. Furthermore, her actions were calculated to disclose possible misconduct and cannot reasonably be said to have involved solely personal disputes that were completely devoid of any relevance to the interest of the community at large. In addition, as far as the context of the state-

ments, many of them were made in public fora and were directed to a small group of people from the community, which further supports the conclusion that the speech involved matters of public concern. *See Koch,* 847 F.2d at 1446–47 (citing, *inter alia, Saye v. St. Vrain Valley Sch. Dist. RE–1J,* 785 F.2d 862, 866 (10th Cir.1986)).

For all of these reasons, the Court concludes that the plaintiff's speech unquestionably, and as a matter of law, involved matters of public concern. As a result, the second phase of the analysis requires this Court to apply the *Pickering* balancing test.

■ The *Pickering* balance requires a court to weigh "the interest of a public employee in commenting on such matters [against] the interest of the employer in promoting the efficiency of its services." *Ware,* 881 F.2d at 910 (citing *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734.) Moreover, "the statement[s] will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899 (citing *Connick,* 461 U.S. at 152–53, 103 S.Ct. at 1692–93; *Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 696 n. 4, 58 L.Ed.2d 619 (1979)), *quoted in Koch,* 847 F.2d at 1449.

■ Under this test, the employee's First Amendment free speech rights are protected "unless the employer shows that some restriction is necessary to prevent the disruption of official functions or to insure effective performance by the employee." *Ware,* 881 F.2d at 910 (citing *Wren,* 798 F.2d at 1318) (quoting *Childers v. Independent Sch. Dist. of Bryan Cty.,* 676 F.2d 1338, 1341 (10th Cir.1982)). The employer's burden is proportional to the intrinsic value that the employee's speech has on the public debate. *Ware,* 881 F.2d at 910 (citations omitted).

■ On the other side of the balance is the employer's interest in its ability to function effectively, which includes considerations such as:

---

**11.** The "atypical" case involves " 'speech' which is off the job and unrelated to any internal func-
tioning of the department." *Flanagan,* 890 F.2d at 1562.

whether the statement[s] impair[ ] discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin,* 483 U.S. at 388, 107 S.Ct. at 2899, *quoted in Ware,* 881 F.2d at 910. To be sure, the employee bears a "burden of caution" with respect to the words that he or she speaks, which varies with the extent of that person's authority and accountability. *See Rankin,* 483 U.S. at 390, 107 S.Ct. at 2900, *quoted in Koch,* 847 F.2d at 1449–50. This burden increases when the employee is involved in a "confidential, policy making or public contact role." *Rankin,* 483 U.S. at 390–91, 107 S.Ct. at 2900.

■ It cannot reasonably be disputed that the plaintiff did in fact hold a "public contact" position. The question remains, however, as to whether the plaintiff's conduct in this case in exercising her First Amendment rights, was injurious to the defendant's ability to perform his official functions, recognizing that the plaintiff's actions involved the exercise of one of the most sacred rights possessed by citizens of this country.

It is clear to this Court that in speaking out on matters already determined to have been of public concern, the plaintiff engaged beneficial and important public debate on matters highly relevant to the community at large. "[D]ebate on public issues should be uninhibited, robust, and wideopen, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Rankin,* 483 U.S. at 387, 107 S.Ct. at 2898 (quoting *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964)). The real question presented under the *Pickering* balance is whether the plaintiff's conduct crossed the line separating legitimate avenues of expression and unnecessarily disruptive and impairing speech.

Taking the setting, context and content of this speech into consideration, the Court has little trouble concluding that the balance in this case weighs in favor of the plaintiff's First Amendment rights. While it is true that the plaintiff was suspended, as opposed to terminated, for alleged insubordination and neglect of duty, there is evidence that supports the inference that this suspension was simply part of a pattern of disciplinary measures which were designed to stifle, impermissibly so, the plaintiff's attempts to achieve an equality of education on behalf of minority and traditionally disadvantaged students. In fact, one of the allegations in the complaint specifically alleges that the defendant's actions were intended as punishment for her failure to conform to the defendant's molds and beliefs, *cf. Rampey v. Allen,* 501 F.2d 1090, 1098 (10th Cir.1974) (*en banc*), *cert. denied,* 420 U.S. 908, 95 S.Ct. 827, 42 L.Ed.2d 838 (1975), an issue discussed in greater detail below under the freedom of association claim. Finally, there is simply a dearth of evidence that the plaintiff's actions impeded the ability of the faculty to perform their daily functions and duties. For all of these reasons, the Court concludes that the *Pickering* balance weighs in favor of the plaintiff's First Amendment rights to free speech as a matter of law.[12]

■ Having thus concluded that the plaintiff's speech involved matters of public concern and that her speech was entitled to constitutional protection under *Pickering,* the final two inquiries under *Gallentine* involve questions of fact as to whether the defendant was motivated to take adverse employment action against the plaintiff because she exercised her First Amendment rights. If she is able to demonstrate that protected speech was a "motivating factor," then the defendant bears the burden of establishing, by a preponderance of the evidence, that it would have reached the same decision in the

---

12. Moreover, while there is some dispute as to the validity of the statement regarding the defendant's doctoral degree, it is clear that "whether [the] defendant[ ] concluded at the time that [the plaintiff's] allegations were false is irrelevant ... because even false allegations are entitled to protection, unless they were knowingly or recklessly made." *Powell,* 992 F.2d at 1091 (citation omitted). There is no evidence that these statements were knowingly or recklessly made, and therefore, these statements are clearly within the ambit of First Amendment protection.

absence of the protected activity. *See Gallentine,* 992 F.2d at 1090.

■ On the motive question, the Tenth Circuit has specifically held that "[e]vidence on the motivating factor issue may be sufficient to support a jury verdict even though it is circumstantial." *Ware,* 881 F.2d at 911 (citations omitted). "A plaintiff may create a reasonable inference of improper motivation by presenting evidence tending to show that the reasons proffered for the adverse action are without factual support." *Id.* (citations omitted). In this case, taking the allegations in the light most favorable to the plaintiff, there is sufficient evidence in the record on the question of motive to create a genuine issue of material fact that precludes the entry of summary judgment. As counsel for the plaintiff accurately noted, the defendant's argument is one that is contingent on the facts and the credibility of the witnesses and harps on the issue of motive, an issue that is generally not amenable to resolution by way of a motion for summary judgment. *See, e.g., Griess v. Consolidated Freightways Corp. of Delaware,* 882 F.2d 461, 463 (10th Cir.1989) (citing *Romero v. Union Pac. R.R.,* 615 F.2d 1303, 1309 (10th Cir.1980) for the proposition that "issues of intent and motive [are] generally inappropriate for summary judgment"). Finally, the Court also finds that this corpus of law was certainly clearly established at the time of the events in question such that the motion for qualified immunity on this claim must also be denied.

### iii. *Freedom of Association*

The plaintiff's next contention is that the defendant's actions violated the plaintiff's First Amendment right to association. There is unquestionably a degree of overlap between this claim and the free expression claim discussed above. Nonetheless, they are analytically distinct claims that require separate discussion. *Cf. Dickeson v. Quarberg,* 844 F.2d 1435, 1440 (10th Cir.1988) (noting that the plaintiffs' due process claims were "distinct" from their freedom of association claims).

■ Although the First Amendment does not specifically refer to the "freedom of association," it has long been held to be a right that is implicit in the freedoms of speech, assembly and petition which are expressly mentioned in that amendment. *See Healy v. James,* 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972) (citing, *inter alia, NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460–61, 78 S.Ct. 1163, 1170–71, 2 L.Ed.2d 1488 (1958)). The Supreme Court has recognized two distinct types of associational freedoms which are protected by the First Amendment.

In one line of decisions, the Court has concluded that choices to enter into and maintain certain intimate human relationships must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme. In this respect, freedom of association receives protection as a fundamental element of personal liberty. In another set of decisions, the Court has recognized a right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion.

*Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984), *quoted in Schalk v. Gallemore,* 906 F.2d 491, 497–98 (10th Cir.1990) (*per curiam*). These bifurcated aspects of the right to associate have been referred to as the "individual and collective components." *Republican Party of the State of Connecticut v. Tashjian,* 770 F.2d 265, 277 (2d Cir.1985), *aff'd,* 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), *quoted in Salvation Army v. New Jersey Dep't of Community Affairs,* 919 F.2d 183, 197 (3d Cir.1990). The Third Circuit stated in the *Salvation Army* case that "[t]he individual component focuses on the effect of a government action on the individual's right to association with other individuals *as a medium for self-expression*[.]" *Salvation Army,* 919 F.2d at 197–98. The Tenth Circuit has described this right as a "species of expression" that includes the "right to be free from personality control[.]" *Rampey,* 501 F.2d at 1098. As the Supreme Court recently stated, the First Amendment "protects an individual's right to join groups and

associate with others holding similar beliefs." *Dawson v. Delaware,* —— U.S. ——, ——, 112 S.Ct. 1093, 1096, 117 L.Ed.2d 309 (1992) (citations omitted). In the present case, the plaintiff is only alleging the first type of associational right regarding her individual liberty and freedom to associate with the people that she chooses.

Having identified the parameters of the right, the question now becomes one of determining the appropriate legal framework that governs this concededly "difficult area of First Amendment jurisprudence." *Dickeson,* 844 F.2d at 1440 n. 6. Some courts, including the Tenth Circuit, have held that the associational analysis in a retaliatory employment case is essentially the same as the analysis that would apply to a free speech claim except that the threshold "public concern" inquiry is not relevant. *See, e.g., Dickeson,* 844 F.2d at 1440 (citing cases such as *Rankin* and *Pickering* and noting that the associational inquiry involves a balancing of competing interests).

*Boddie v. City of Columbus,* 989 F.2d 745 (5th Cir.1993) held that "[a] public employee's claim that he has been discharged for his political affiliation in violation of his right to freely associate is not subject to the threshold public concern requirement." *Id.* at 747 (citing *Coughlin v. Lee,* 946 F.2d 1152, 1158 (5th Cir.1991)); *accord Green v. City of Montgomery,* 792 F.Supp. 1238 (M.D.Ala. 1992) (stating that public employees are shielded from retaliation on the basis of their associational activities "whether or not such activity relates to a matter of public concern."). The *Green* court went on to note that in analyzing associational claims, a court should apply the last three of the four components of the free speech inquiry. *Id.* In *Broderick v. Roache,* 767 F.Supp. 20 (D.Mass.1991), the district court noted that there was no basis to provide associational freedoms with a "higher level of protection than the right of free speech." *Id.* at 25 n. 9. That court went on to state that although *Connick* was a free speech case, it nonetheless "contain[ed] associational overtones[,]"

and thus, these two types of claims "should be analyzed under the same standard set forth in *Connick.*" *Id.*[13]

Finally, it should be noted that *Rampey,* a leading Tenth Circuit decision on associational freedoms, also relied on *Pickering* as the basis for its legal analysis. *See Rampey,* 501 F.2d at 1097–98.

▇▇▇ For all of the foregoing reasons, the Court concludes that the analysis of the plaintiff's freedom of association claim should be governed by the principles applicable to her freedom of speech claim discussed above, except for the public concern requirement. As a result of the Court's discussion above on the *Pickering* balance, it is clear the remaining inquiries regarding the defendant's motive are factual issues for a jury to decide. Of course, the critical difference between the plaintiff's free speech claim and the free association claim is the motive issue. While each cause of action requires proof of an impermissible motive, one requires the trier of fact to determine whether the plaintiff's oral statements were "a motivating factor" in the decision to suspend the plaintiff, while the other asks whether her associations were "a motivating factor." Thus, it is possible for the jury to find no liability, liability as to one claim but not the other, or liability as to both claims, since each need only be "a" motivating factor and not the "sole" factor. *See Gallentine,* 992 F.2d at 1090.

In applying these principles to this case, the Court finds *Rampey* to be an instructive precedent. The plaintiffs in *Rampey* were fourteen faculty members and administrative officers of the Oklahoma College of Liberal Arts. On April 26, 1973, the school's president, Dr. Bruce Carter, issued his recommendation that the plaintiffs not be rehired. The board of regents accepted the recommendation by a vote of five to two, but in so doing, they gave no reasons for their actions.

The plaintiffs subsequently filed suit alleging that the decision to terminate them was based on their exercise of their First Amend-

---

13. *Broderick* recognized that *Saye,* a Tenth Circuit case, implicitly held that an associational challenge to an alleged retaliatory discharge involving union activities would not be tested under *Connick.* *See Broderick,* 767 F.Supp. at 25 n. 9 (citing *Saye,* 785 F.2d at 867 & n. 1). Nonetheless, the case at bar is distinguishable from *Saye* as it does not involve union-based activities.

ment right to free expression (i.e., free speech and free association). At a trial to the court, Dr. Carter testified that the decision was based in part on the fact that the plaintiffs were "divisive." Although the district court found that the plaintiffs' "divisiveness" was in fact the basis for the decision not to rehire the plaintiffs, the Court concluded that there was no nexus between the nonrenewal of the plaintiffs' contracts and the plaintiffs' First Amendment rights. On appeal, the Tenth Circuit, sitting en banc, reversed this "frivolous" conclusion, finding it to be "out of harmony with the evidence and clearly erroneous." *Id.* at 1099. The Court stated that:

> the First Amendment rights of the plaintiffs, as enunciated in such decisions as [*Perry v.*] *Sindermann* [408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)] and *Pickering, supra,* were violated by terminating plaintiffs on account of disapproved associations, or disapproval of statements made, *or on account of President Carter's disagreement with plaintiffs' philosophies,* or his beliefs that plaintiffs lived in a different world from his[.]

*Rampey,* 501 F.2d at 1099 (emphasis added) (footnotes omitted). Several other excerpts from that decision are noteworthy. The Tenth Circuit's independent review of the evidence led it to state that:

> the plaintiffs were fired for having failed to refrain from associating with their colleagues and for having failed to associate with President Carter. Thus, we conclude that, *in exercising their right to freely associate with others and to criticize the administration of the school (notwithstanding that such criticism was justifiable) and in refusing to submit to the exercise of control over them, the plaintiffs were fired.*

*Id.* at 1096 (emphasis added). Finally, the Court commented on the role of a college president, stating:

> [w]hile a college president is entitled to respect and authority within his sphere, this does not extend to the exercise of absolute control over the associations and expressions of the faculty members. Whether they demonstrate loyalty to him

personally, whether they relate to him personally and whether they have a similar philosophy is not, as we view it, a requisite and *he cannot demand such attitudes at the expense of the individual rights of the faculty members and there can be little question but that such demands infringe the rights of the faculty members to express legitimate views in the course of formulating ideas in an academic atmosphere.*

*Id.* at 1098 (emphasis added).

In the present case, there is evidence that the defendant and the plaintiff did not see eye-to-eye on various matters of public and social importance. The evidence regarding the incidents with Jane Sullivan and Dr. Gonzales could support an inference that the defendant was dissatisfied with the plaintiff's association with these individuals and their respective organizations. This dissatisfaction was reflected in part in the letter of suspension which stated that the plaintiff's conversations with Dr. Gonzales were improper because she had not advocated the "official position" of EWC on those matters. There are also allegations that the defendant continuously referred to the need to recruit the "proper" type of student and to "change" the makeup of the student population. In addition, during the same time period, the reference to "non-traditional students" had been eliminated from the plaintiff's job description. All of these pieces of evidence could certainly support an inference that the adverse employment action taken against the plaintiff may have been motivated by her associational choices, which, as noted above, is impermissible "personality control" under *Rampey* and its progeny. Because there is a genuine issue of material fact on the motive issue, the motion for summary judgment must be denied.

■ Moreover, it is apparent that the law regarding retaliatory action on the basis of associational values has been well-established in this circuit since the 1974 decision in *Rampey* such that the motion for summary judgment based on qualified immunity must be denied.

#### iv. *Equal Protection*

The plaintiff also asserts that the defendant's actions violated the equal protection clause of the Fourteenth Amendment. Plaintiff's primary reliance is on the decision in *Trister v. University of Mississippi*, 420 F.2d 499 (5th Cir.1969). The problem with this argument is that there is no evidence that shows that the defendant treated other similarly situated individuals differently from the plaintiff, as was the case in *Trister*. In *Trister*, the Fifth Circuit found a violation of equal protection where the university permitted its part-time professors to work in the private sector but denied other part-time professors, the plaintiffs, the right to work in the public sector on behalf of a legal services, public interest organization that was unpopular with the trustees of the university.

The present case, however, simply does not implicate traditional equal protection concerns. If, for example, there were allegations that the defendant gave more favorable treatment to other individuals who performed analogous work to that of the plaintiff, except that they did not work with the economically disadvantaged and minority students with whom the plaintiff worked, then an equal protection issue might be involved. That is not the case here.

Moreover, even if there was a claim for a violation of equal protection, the plaintiff's reliance on *Trister* and several district court decisions is not sufficient to establish clearly that such conduct was actionable under the equal protection clause. While the principle of equal protection is certainly settled, the cases mandate more than reference to generalized legal principles. The Court finds that the cases relied on by the plaintiff are insufficient as a matter of law to overcome the defendant's claim of qualified immunity with respect to this cause of action.

#### v. *Title VII*

The plaintiff's final contention is that the defendant's actions violated the clear mandates of Title VII. The problem with this argument is that the plaintiff has not submitted any evidence to show that she has filed an administrative grievance with the appropriate authorities. Therefore, this claim must be dismissed on the grounds that the plaintiff failed to exhaust her remedies. In addition, the defendant's reliance on *Great American Fed. Savings and Loan Ass'n v. Novotny*, 442 U.S. 366, 379, 99 S.Ct. 2345, 2352, 60 L.Ed.2d 957 (1979) for the proposition that the plaintiff's Title VII claim is "the exclusive remedy for employment based discrimination alleging retaliation" and that "42 U.S.C. § 1983 may not be invoked to redress violations of Title VII" is not only misplaced, but represents a gross misstatement of that decision.

*Novotny* held that § 1985(3) could not be invoked to redress violations of Title VII and that no cause of action existed under that statute for an alleged conspiracy to violate Title VII. *Id.* at 372, 378, 99 S.Ct. at 2349, 2352. Even a cursory reading of that opinion reveals that the case had absolutely nothing to do with a cause of action under § 1983. Therefore, while this claim must be dismissed for failure to exhaust administrative remedies, this conclusion was in no way influenced by *Novotny* as it is a completely inapposite precedent.

#### 3. *Official Capacity Liability*

Because this Court granted defendant Mason's motion for summary judgment in his individual capacity with respect to the due process, equal protection and Title VII claims, it follows *a fortiori* that the plaintiff cannot recover on these claims against the defendant in his official capacity. Therefore, the defendant is entitled to summary judgment on these claims in his official capacity.

With respect to the First Amendment claims against defendant Mason for which summary judgment was denied, he has asserted another defense in his official capacity. He alleges that the Eleventh Amendment bars the official capacity portion of the lawsuit seeking damages on the grounds that "a State, or an official of the State while acting in his or her official capacity" is not a "person" within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). For reasons given below, the Court is not persuaded by this argument and the motion is therefore denied.

### a. The Eleventh Amendment

While it is clear that defendant's interpretation of *Will,* or, more accurately, of *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974),[14] is undoubtedly correct—that a State or a named official is not a "person" for purposes of § 1983—this conclusion necessarily assumes away an important threshold question, which is whether EWC is in fact an "arm of the State" so as to fall within the purview of *Edelman* or whether EWC is more akin to a local or municipal government and therefore not an arm of the state government.[15]

The issue before this Court is strikingly similar to the issue before the Supreme Court in *Mt. Healthy City School Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In that case, the Court stated:

> [t]he issue here turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.

*Id.* at 280, 97 S.Ct. at 572. The Court ultimately concluded that a school board was more like a "county or city than it is like an arm of the State[,]" thereby making the Eleventh Amendment inapplicable. *Accord Stoddard v. School District No. 1, Lincoln County, Wyoming,* 429 F.Supp. 890, 892–94 (D.Wyo.1977) (Brimmer, J.), *aff'd in part and rev'd in part,* 590 F.2d 829, 835 (10th Cir.1979).

The parties rely on various provisions of Wyoming law in support of their respective positions that a community college either is or is not an arm of the state. The defendant analogizes a community college to other institutions which have been recognized as arms of the state, such as state prisons or state mental institutions. The Court finds this analogy to be misplaced and agrees with the plaintiff's argument that, on the whole, a community college is more analogous to a local school board and therefore is not entitled to Eleventh Amendment protection under *Stoddard* and *Mt. Healthy.*

In the Wyoming Governmental Claims Act, the state legislature defined a "local government" to include, *inter alia,* "community college districts." Wyo.Stat. § 1–39–103(a)(ii) (1988). Equally persuasive is the plaintiff's argument that this statute does *not* include the University of Wyoming, since that entity is considered an arm of the state under § 1–35–101. When these two provisions are read in conjunction with each other, the conclusion is inescapable that the Wyoming legislature knew how to classify particular entities as either state or local entities. The maxim *expressio unius est exclusio alterius* is instructive on this point. *Cf. Leatherman,* —— U.S. at ——, 113 S.Ct. at 1163.

Moreover, community colleges and school districts, as well as the University of Wyoming, are governed by Boards of Trustees. Yet, the trustees of the latter are appointed by the Governor with the consent of the state Senate, whereas the trustees of the former are elected by the voters who live within the limits of the particular district or community. *Compare* Wyo.Stat. § 21–18–308(a) (1992) (community college trustees are elected) *with* Wyo.Stat. § 21–17–202(a) (1992) (University trustees are appointed). Finally, unlike state prisons, community colleges have the author-

---

**14.** Literally speaking, the "holding" of *Will* does not rest directly on the Eleventh Amendment. The Eleventh Amendment bars suits brought against a state in *federal* court. *Will* involved a suit brought in state court, and thus, the Eleventh Amendment could not be the basis for the Court's holding. *See, e.g., Hafer,* —— U.S. at ——, 112 S.Ct. at 364. *Will* did speak to the Eleventh Amendment, but for the purpose of statutory construction, and not as the specific basis for the Court's holding.

The proper precedent for the view urged by the defendant is *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), which specifically held that the Eleventh Amendment bars suits in federal court "by private parties seeking to impose a liability which must be paid from public funds in the state treasury[.]" *Id.* at 663, 94 S.Ct. at 1356.

**15.** As noted above, *Monell* specifically held that "local government units which are not considered part of the State for Eleventh Amendment purposes" were "persons" within the meaning of § 1983. *Monell,* 436 U.S. at 690 n. 54, 98 S.Ct. at 2035 n. 54.

ity to charge tuition and student fees, *see* Wyo.Stat. § 21–18–303(a)(vii), and the power to issue revenue and general obligation bonds. *See* Wyo.Stat. § 21–18–303(a)(v)–(vi).

■ A careful examination of all of these factors leads this Court to conclude that there is no meaningful distinction between a local school board and a community college for Eleventh Amendment purposes, and as a result, *Mt. Healthy* and *Stoddard* are dispositive in holding that the Eleventh Amendment is inapplicable. Therefore, the defendant's motion for summary judgment in his official capacity on the grounds of Eleventh Amendment immunity must be denied.[16]

### b. *Real Party in Interest*

The defendant also moved to dismiss the complaint on the grounds that the plaintiff has not sued the real party in interest and that the proper party-defendant is the community college district board. The defendant argues that § 21–18–303(a)(i) (1988) compels dismissal of this action. This Court is not persuaded.

■ Rule 17(a) provides, in relevant part, that "[e]very action shall be *prosecuted* in the name of the real party in interest." FED. R.CIV.P. 17(a) (emphasis added). Thus, the rule, by its own terms, only applies to plaintiffs since that is the party who is "prosecuting the action." As one leading authority stated:

> the real party in interest principle is a means to identify the person who possesses the right sought to be enforced. Therefore, the term directs attention to whether [the] plaintiff has a significant interest in the particular action he has instituted, *and Rule 17(a) is limited to plaintiffs.*

6A Charles A. Wright et al., *Federal Practice and Procedure* § 1542 at 327 (1990) (footnotes omitted) (emphasis added). As a re-

sult, it is improper for a defendant to complain that it is not the real party in interest.

■ Moreover, even if this rule did apply in this case, the Court is not persuaded by the defendant's tortured interpretation of the statute governing community college district boards. That statute provides that "[t]he community college district board *may* [s]ue and be sued in the name by which the district is designated." Wyo.Stat. § 21–18–303(a)(i) (emphasis added). This statute clearly provides that, in the appropriate case, the board may be sued when it is alleged to have committed a wrong. The statute does not *mandate* that the board must be sued in every case in which it might tangentially be involved. In short, the use of the permissive term "may" represents the legislature's intention to allow a party to sue the board when the wrong to be redressed was allegedly inflicted by that entity. The defendant's reading of the statute is unsupported by its plain language as well as by common sense.

Once again, even if Rule 17(a) somehow applied in this case, it is clear that dismissal is not an appropriate remedy, at least "until a reasonable time has been allowed after objection" to cure the defect. For all of the aforementioned reasons, this motion must also be denied.

### 4. *Defamation*

As noted above, the plaintiff has also asserted a pendent state law claim for defamation. Although the Court concluded that the plaintiff's liberty interest claim was insufficiently stigmatizing as a matter of law, this ruling in no way forecloses the plaintiff's state law defamation claim.

■ The defendant has moved for summary judgment as to this claim on two procedural grounds. His first argument is that the Court should decline to exercise supplemental jurisdiction over this claim under 28

---

**16.** Moreover, even if the Eleventh Amendment applied, the defendant's assertion that the plaintiff's claim for prospective injunctive relief is also barred by that amendment is a clear misstatement of law.

It has been well-settled for almost ninety years that the Eleventh Amendment only bars suits in federal court where the claim seeks *damages* against a state, or an arm of the state; the

amendment is inapplicable with respect to claims for prospective injunctive relief. *See Edelman*, 415 U.S. at 664, 94 S.Ct. at 1356 (*"Ex Parte Young* [, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)] was a watershed case in which this Court held that the Eleventh Amendment did not bar an action in the federal courts seeking [prospective injunctive relief.]").

U.S.C. § 1367(c)(3). This argument anticipated that this Court would grant the motions for summary judgment on all of the federal claims. Because the Court has ruled otherwise, this aspect of the motion must be denied.

The other aspect of this motion involves state law immunity pursuant to the Wyoming Governmental Claims Act, Wyo. Stat. § 1–39–101 et seq. (1988). The defendant argues that he is immune under this act from liability in tort since liability for defamation has not been waived.

The relevant portion of that statute provides that:

> [a] governmental entity and its public employees while acting within the scope of duties are granted immunity from liability for any tort except as provided by [Wyo. Stat.] 1–39–105 through 1–39–112.

Wyo.Stat. § 1–39–104(a) (1988). While the defendant notes that the plaintiff's defamation claim does not fall within the ambit of waived immunity under § 1–39–105 to –112, an issue that the plaintiff does not dispute, the defendant's argument overlooks a critical threshold issue, which is whether the defendant's actions were "within the scope of duties." It is apparent that there is a genuine issue of material fact regarding the question of whether the defendant acted within the scope of his duties in allegedly defaming the plaintiff. Thus, the determination of immunity is contingent on the resolution of this factual issue such that this issue cannot be resolved at this early stage of the proceedings.

**THEREFORE,** it is

**ORDERED** that the Defendant's Motion for Summary Judgment in both his Individual and Official Capacities be, and the same hereby are, **GRANTED** with respect to plaintiff's due process, equal protection and Title VII claims, and **DENIED** with respect to plaintiff's First Amendment freedom of expression and association claims.