**Tiffney GRINER, Plaintiff,**

v.

**SOUTHEAST COMMUNITY COL- LEGE, a political subdivision of the State of Nebraska; Paul Kaufman; Ted Suhr; and Jack Huck, individual- ly and in their official capacities as officials of Southeast Community Col- lege, Defendants.**

**No. 4:99CV3181.**

United States District Court, D. Nebraska.

May 4, 2000.

Sue Ellen T. Wall, Lincoln, NE, for plaintiff.

John M. Guthery, Jr., Perry, Guthery Law Firm, Lincoln, NE, for defendants.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

On March 30, 2000, this court granted in part Defendants' motion for summary judgment on the merits, leaving for trial Plaintiff's 42 U.S.C. § 1983 First Amend- ment claim against defendant Southeast Community College ("SCC") and against defendant Paul Kaufman in his official ca- pacity for equitable, prospective relief and in his individual capacity for money dam- ages, declaratory relief, and injunctive re- lief. (Filing 57.) In its order on summary judgment, the court noted that while the parties had preserved the issue of the defendants' entitlement to Eleventh Amendment immunity in the Order on Fi- nal Pretrial Conference (filing 55, at 3), the parties had not raised the issue in any pretrial motions. Accordingly, the court did not address the Eleventh Amendment issue at that time and invited the parties to consider how the issue would be handled in the context of a jury trial. (Filing 57, at 10 & n. 7.)

Two weeks prior to trial, the parties requested that the court resolve the issue of whether SCC is entitled to Eleventh Amendment immunity against Plaintiff's claim for money damages. Pursuant to the court's order, the parties submitted relevant stipulated facts and briefs on the Eleventh Amendment immunity issue one week prior to trial. (See Filing 63.) After an exhaustive review of the parties' sub- missions, relevant case law, statutes, the Nebraska Constitution, and other sources, the court concluded that SCC is not an arm of the state entitled to Eleventh Amendment immunity against Plaintiff's

claim for money damages. In order to promptly notify the parties of its decision in light of the quickly-approaching trial date, the court issued an abbreviated order (filing 73) announcing its decision, stating that a memorandum containing the court's analysis would be issued as soon as possible. The court now issues its memorandum supporting its conclusion that SCC is not entitled to Eleventh Amendment immunity against Plaintiff's claim for money damages.

## I. FACTUAL BACKGROUND

### A. Statutory and Constitutional Provisions

1. Defendant Southeast Community College ("SCC") is a community college organized under the laws of the state of Nebraska and constitutes a body corporate which may sue and be sued. Neb.Rev. Stat.Ann. § 85–1505 (Lexis 2000). The Nebraska Legislature has clearly stated that "primary control" of the state's community colleges lies with local citizens, subject to "coordination" by the Coordinating Commission for Postsecondary Education. "It is the intent and purpose of [the statutes governing community colleges] to create locally governed and locally supported community college areas.... Each community college area is intended to be an independent, local, unique, and vital segment of postsecondary education separate from both the established elementary and secondary school system and from other institutions of postsecondary education and is not to be converted into a four-year, baccalaureate-degree-granting institution." Neb.Rev.Stat.Ann. § 85–1501 (Lexis 2000).

2. Nebraska's six community college areas are governed by boards whose eleven members are elected. Neb.Rev.Stat. Ann. §§ 85–1504, –1506, –1512 (Lexis 2000). Each such board has "general supervision, control, and operation" of its community college and has authority to develop and offer educational programs "[s]ubject to coordination by the Coordinating Commission for Postsecondary Education"; to employ executive officers, faculty, administrative officers, and employees and set their salaries and duties; to construct, lease, purchase, operate, equip, and maintain facilities, again subject to coordination by the Coordinating Commission for Postsecondary Education; to have its books and records audited to gather information used to calculate state aid to community colleges, with such audit being filed with the Auditor of Public Accounts and the Department of Administrative Services; to establish fees, charges, and tuition rates; to receive gifts, grants, conveyances, and bequests of real and personal property; to prescribe courses of study; to acquire real property by eminent domain; to acquire real and personal property and sell, convey, or lease such property; and to invest funds in securities. Neb.Rev.Stat.Ann. § 85–1511 (Lexis 2000). Each board may issue and sell revenue bonds and general obligation bonds, none of which "shall be an obligation of the State of Nebraska, and no state tax shall be levied to raise funds for the payment thereof or interest thereon." Neb.Rev.Stat.Ann. §§ 85–1515 & –1521 (Lexis 2000). Further, each board may certify tax levies to the county board of equalization for purposes of supporting operating expenditures and for other uses. Neb.Rev.Stat.Ann. § 85–1517 (Lexis 2000).

3. In order to assure continued state economic growth, the Legislature has provided that "community colleges should be financed through a funding partnership from property tax, state aid, tuition, and other sources of revenue." Neb.Rev.Stat. Ann. § 85–1501.01 (Lexis 2000). In an effort to avoid excessive and disproportionate property taxation and to insure that all geographic locations receive quality educational programs regardless of the size, wealth, or geographic location of the community college area, the Legislature "may" appropriate funds to the state's community colleges. Neb.Rev.Stat.Ann. § 85–1536

(Lexis 2000). The Department of Administrative Services must reduce the distribution of funds to the community colleges by the amount of funds used to provide a program or capital construction which has not been approved or which has been disapproved by the Coordinating Commission for Postsecondary Education. Neb.Rev. Stat.Ann. § 85–1536(3) (Lexis 2000).

4. Because some community college areas have a better ability to raise revenue through property taxes, it is the Legislature's "intent" to appropriate funds to provide property tax relief to areas that cannot generate a sufficient amount of their operating revenue through taxation. Neb. Rev.Stat.Ann. § 85–1536.01 (Lexis 2000).

5. SCC's use of the revenues it receives is audited by the State Auditor. SCC must submit a biennium budget to the Legislature requesting that state funds be allocated to SCC by the Legislature. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶ 8.)

6. The Nebraska Constitution establishes the Coordinating Commission for Postsecondary Education which is vested with authority to coordinate public postsecondary educational institutions, including community colleges like SCC. Neb. Const. art. VII § 14. "Coordination," within the meaning of this provision, means defining the role and mission of each public postsecondary educational institution "within any general assignments of role and mission as may be prescribed by the Legislature's creating plans for facilities that use tax funds designated by the Nebraska Legislature; reviewing, monitoring, and approving the institutions' programs and capital construction projects that utilize tax funds designated by the Legislature; and reviewing and modifying budget requests made by a community college board if necessary to promote compliance with the Commission's statewide plan and to prevent unnecessary duplication." *Id.;* Neb.Rev.Stat.Ann. §§ 85–1413 & –1414 (Lexis 2000) (implementing above provisions). Coordination of Nebraska's

community colleges by the Coordinating Commission for Postsecondary Education must be conducted through an association of community college boards. Neb.Rev. Stat.Ann. § 85–1502 (Lexis 2000).

7. While the Legislature recognizes that statewide coordination of community college areas through the Coordinating Commission for Postsecondary Education is appropriate in order to provide cost-effective programs, "[n]othing in [the statute providing for such coordination] shall be construed to require or provide for state control of the operations of any community college area or to abridge the governance ability, rights, or responsibilities of any board." Neb.Rev.Stat.Ann. § 85–1502 (Lexis 2000).

8. In an effort to coordinate a quality and accessible state system of postsecondary education and limit program and facility duplication, the Nebraska Legislature has defined the community colleges' "instructional and service" priorities to include applied technology, occupational and "foundations" education, transfer programs, public service (like adult continuing education), and applied research. Neb. Rev.Stat.Ann. §§ 85–917 & 85–962 (Lexis 2000). The Legislature has also provided that "[n]o funds generated or received from a General Fund appropriation, state aid assistance program, or receipts from a tax levy authorized by statute shall be expended in support of programs or activities which are in conflict with the role and mission assignments applicable to ... community colleges...." Neb.Rev.Stat.Ann. § 85–933 (Lexis 2000).

9. Nebraska community colleges may indemnify their board members, officers, employees, or agents against attorneys' fees, judgments, and amounts paid in settlement in connection with civil, criminal, administrative, and investigative proceedings or suits. Neb.Rev.Stat.Ann. § 85–1510 (Lexis 2000).

10. Throughout the Nebraska Revised Statutes, community colleges are defined

as political subdivisions, as are cities, counties, and school districts. *See, e.g.,* Neb. Rev.Stat.Ann. §§ 13–916, 13–1612, 32–1203, 77–3443 (Lexis 1995 & Supp.1999).

### B. Factual Stipulations

11. SCC is a tax-exempt organization and does not pay state or federal income tax or sales tax. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶ 2.)

12. SCC receives funds for its operations from state revenues, local property tax revenues, tuition, grants, and gifts. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶ 3.)

13. SCC operates on a fiscal year of July 1 through June 30. The current fiscal year began on July 1, 1999, and will end June 30, 2000. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶ 4.) The operating budget for SCC for the 1999–2000 fiscal year is approximately $35,588,070. Of this amount, at least 57.76 percent was funded from state revenue ($20,577,900), property taxes provided approximately 15 percent ($5,491,952), tuition accounted for approximately 25.22 percent, and the balance of 2.02 percent came from grants, gifts, and miscellaneous contributions. SCC must pay all of its operating expenses for the college from these revenue sources. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶¶ 5 & 7.)

14. The fiscal year 2000–2001 is the second year of the current budget biennium, and the amount of state aid will not decrease for SCC for that fiscal year. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶ 6.)

15. SCC, prior to July 1, 1999, entered into an agreement with three other community colleges for the purpose of creating and funding the Nebraska Community College Insurance Trust ("Trust"). Each community college that entered into the agreement makes a contribution to the trust, which is used to pay premiums and a self-insured retention (similar to a deductible) for claims made against any community college covered by the Trust. The Trust carries excess coverage for liability through United National Insurance Company. The coverage limits for employment-related practices is $1 million per claim and $2 million aggregate for all claims, per year. The Trust is responsible for paying the first $50,000 of any such claim. As to the plaintiff's claim, the Trust, for SCC, would have to pay the first $50,000 of the claim, and any amount over and above that would be covered by the excess insurance policy. The funds placed into the Nebraska Community College Insurance Trust by SCC come from its operating budget. For the 1999–2000 fiscal year, the amount paid by SCC to the Trust was $261,174. The terms of the United National Insurance Company policy do not waive any immunity which might otherwise exist for SCC. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶¶ 11 & 12.)

## II. DISCUSSION

[T]he Eleventh Amendment limits the jurisdiction of the federal courts only as to suits against the state. It is settled that a suit against a county, a municipality, or other lesser governmental unit is not regarded as a suit against a state within the meaning of the Eleventh Amendment. Unless a political subdivision of the state is simply the "arm or alter ego of the state," it may sue and be sued pursuant to the same rules as any other corporation.

*Greenwood v. Ross,* 778 F.2d 448, 453 (8th Cir.1985) (quoting *Gilliam v. City of Omaha,* 524 F.2d 1013, 1015 (8th Cir.1975)) (citation omitted). While "[s]tate universities and colleges almost always enjoy Eleventh Amendment immunity," such immunity is not so apparent for community colleges due to local political and financial involvement in community colleges. *Hadley v. North Arkansas Community Tech. College,* 76 F.3d 1437, 1438 (8th Cir.1996),

*cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997). Thus, the question whether defendant Southeast Community College is entitled to Eleventh Amendment immunity from Plaintiff's section 1983 claim for damages is difficult and fact-specific. *Id.* at 1439.

The Eighth Circuit's approach for deciding whether a particular institution of higher learning is entitled to Eleventh Amendment immunity requires a court to:

> examine the particular entity in question and its powers and characteristics as created by state law to determine whether the suit is in reality a suit against the state. Courts typically look at the degree of local autonomy and control and most importantly whether the funds to pay any award will be derived from the state treasury.

*Id.* at 1439. With regard to whether payment of the judgment would come from the state treasury, the entity invoking Eleventh Amendment immunity should "explain why payment of contractual damages would *necessarily* implicate the state fisc." *Sherman v. Curators of Univ. of Missouri,* 16 F.3d 860, 864 (8th Cir.1994) (emphasis in original).

### A. Nature of SCC: Powers, Characteristics, Local Autonomy, Local Control

As set forth above, the Nebraska Legislature has clearly and expressly stated its intent that Nebraska's community colleges be primarily controlled, governed, and supported by local citizens. Neb.Rev.Stat. Ann. § 85–1501 (Lexis 2000). Each of Nebraska's six community college areas are governed by elected boards that supervise, control, and operate the community colleges in terms of educational program development, facility construction and maintenance, staffing, and tuition and fee levels. Neb.Rev.Stat.Ann. §§ 85–1504, –1506, –1511, –1512 (Lexis 2000). While educational program development and facility construction and maintenance are "subject to coordination" by the Coordinating Commission for Postsecondary

Education, the Legislature has expressly provided that such coordination should not be construed as "state control" of Nebraska's community colleges or their boards. Neb.Rev.Stat.Ann. § 85–1502 (Lexis 2000).

It is not an accurate characterization to say that Nebraska's community colleges are controlled by the Coordinating Commission for Postsecondary Education or by the state of Nebraska itself; rather, the Nebraska Legislature has expressly provided just the opposite. The Legislature requires that coordination of Nebraska's community colleges by the Coordinating Commission for Postsecondary Education be conducted through an association of community college boards, and that "[n]othing in [the statute providing for such coordination] shall be construed to require or provide for state control of the operations of any community college area or to abridge the governance ability, rights, or responsibilities of any board." Neb.Rev.Stat.Ann. § 85–1502 (Lexis 2000).

It is not the role of the Coordinating Commission for Postsecondary Education to control or govern individual community colleges, but to implement and further define the Legislature's role and mission assignments for *all* public postsecondary educational institutions—in large part to prevent duplication and promote cost-effectiveness—and to review and approve educational programs and capital construction projects that utilize state funds. If a community college's state-funded educational program or capital construction project is not approved or is disapproved by the Coordinating Commission for Postsecondary Education, the Nebraska Department of Administrative Services must reduce the state's distribution of funds to the community college by the amount of state funds used to provide such program or construction. Neb.Rev.Stat.Ann. § 85–1536(3) (Lexis 2000).

Unlike the Commission's role of coordination of all postsecondary educational institutions as they relate to one another, Nebraska's community college boards have

statutory authority to control and govern their community colleges by acquiring real property by eminent domain; acquiring real and personal property and selling, conveying, or leasing such property; investing funds in securities; establishing fees, charges, and tuition rates; and receiving gifts, grants, conveyances, and bequests of real and personal property. Neb.Rev.Stat.Ann. § 85–1511 (Lexis 2000). Importantly, each board may issue and sell revenue bonds and general obligation bonds, none of which "shall be an obligation of the State of Nebraska, and no state tax shall be levied to raise funds for the payment thereof or interest thereon." Neb.Rev.Stat.Ann. §§ 85–1515 & –1521 (Lexis 2000). Further, each board may certify tax levies to the county board of equalization for purposes of supporting operating expenditures and for other uses. Neb.Rev.Stat.Ann. § 85–1517 (Lexis 2000). Pursuant to its powers to cause local taxes to be levied, to set tuition payments, and to receive gifts and grants, SCC provided approximately 42.24 percent of its operating budget for the 1999–2000 fiscal year.

Thus, SCC operates largely independently, locally, and with significant authority to govern itself and to acquire its own operating funds from local sources.

### B. Extent to Which Judgment Would Be Derived From State Treasury

Pursuant to a "funding partnership" consisting of property tax, state aid, tuition, and other sources of revenue, Neb. Rev.Stat.Ann. § 85–1501.01 (Lexis 2000), and in an effort to avoid excessive and disproportionate property taxation and to insure quality community college programs across all geographic locations, the Legislature "may" appropriate funds to the state's community colleges, Neb.Rev.Stat. Ann. § 85–1536 (Lexis 2000). Further, because some community college areas have a better ability to raise revenue through property taxes, it is the Legislature's "intent" to appropriate funds to provide property tax relief to areas that cannot gener-

ate a sufficient amount of their operating revenue through taxation. Neb.Rev.Stat. Ann. § 85–1536.01 (Lexis 2000).

The operating budget for SCC for the 1999–2000 fiscal year is approximately $35,588,070. Of this amount, approximately 57.76 percent was funded from state revenue and 42.24 percent came from other sources—specifically, 15 percent from property taxes, 25.22 percent from tuition, and 2.02 percent from grants, gifts, and miscellaneous contributions. SCC must pay all of its operating expenses for the college from these revenue sources. (Filing 65, Stipulation Regarding Eleventh Amendment Immunity Issue ¶¶ 5 & 7.)

There is neither evidentiary nor statutory evidence that the state of Nebraska would necessarily be liable for payment of a judgment rendered against SCC in this case.

### C. Application of Hadley

In *Hadley v. North Arkansas Comm. Tech. College,* 76 F.3d 1437 (8th Cir.1996), *cert. denied,* 519 U.S. 1148, 117 S.Ct. 1080, 137 L.Ed.2d 215 (1997), the Eighth Circuit Court of Appeals found that an Arkansas community technical college was an arm of the state entitled to Eleventh Amendment immunity. In reaching its conclusion, the court took into account several facts, state statutes, and state constitutional provisions which are readily distinguishable from those now before the court: a statute that required the state to provide community colleges "[f]unds for the general operation of an adequate comprehensive educational program"; state-supported institutions of higher learning that "function[ed] under appropriation made by the General Assembly," such as community colleges, were defined as "state agencies" for purposes of state appropriation and expenditure procedures; the community college at issue was defined as a "State agency" under the State Building Services Act; the community college's campus was state-owned; the community college had never received any funds for general operations from local tax

levies; the college's operating expense revenues were 75.1 percent state-appropriated funds, 22.1 percent tuition payments, and 2.8 percent federal grants and private donations; a judgment against the community college would produce an operating budget shortfall which, by state law, must have been satisfied by an appropriation from the state treasury; and the State Board of Higher Education, which was appointed by the governor and confirmed by the senate, acted as the State Community College Board, had active participation in the community college's day-to-day operations, and had the power to withhold state funding if the community college failed to comply with "prescribed standards of administration or instruction." *Id.* at 1439–42.

In this case I cannot conclude, as did the *Hadley* court, that the Nebraska Legislature has made SCC's "daily operations financially dependent upon the state treasury" or that a judgment against SCC "would produce a higher operating budget shortfall that must, by state law, be satisfied by an appropriation from the state treasury." Unlike the situation in *Hadley*, Nebraska has not statutorily defined SCC as a state agency, but has instead generally defined community colleges as political subdivisions; the state of Nebraska does not provide "ultimate state control"; and the funds for SCC's general operations do not come "primarily from the state treasury." *Id.* at 1441–42. As found above, SCC operates in an independent manner with significant authority to govern itself and to acquire its own operating funds from local sources. Further, there is neither evidentiary nor statutory evidence that the state of Nebraska would necessarily be liable for payment of a judgment rendered against SCC in this case.

Thus, I reach a conclusion opposite from that reached in *Hadley*, and I find that SCC is not an arm of the state entitled to Eleventh Amendment immunity from Griner's 42 U.S.C. § 1983 First Amendment claim for money damages. *See Mt.*

*Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280–81, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) ("[o]n balance," school board was more like county or city and not entitled to Eleventh Amendment immunity when state law provided that "State" did not include "political subdivisions" and local school districts were defined as "political subdivisions"; local school board was subject to some guidance from State Board of Education; school board received significant amount of money from state; and school board had extensive powers to issue bonds and levy taxes); *Korgich v. Regents of New Mexico School of Mines*, 582 F.2d 549, 551 (10th Cir.1978) (Eleventh Amendment immunity applied to New Mexico School of Mines when school was operated and managed by corporate body charged with complete management of the school with the right to sue and be sued, but school's budget was subject to review and adjustment by state board of educational finance and was payable from the state treasury); *Hander v. San Jacinto Junior College*, 519 F.2d 273, 279 (5th Cir.) (junior college not entitled to Eleventh Amendment immunity when state statutes authorized coordinating board to exercise general control over junior colleges, but junior colleges retained residual administrative authority; junior college districts began with local initiative; electorate selected board of trustees to operate college; junior college trustees had power to issue revenue bonds and levy taxes; and state appropriated money to junior colleges in an "amount sufficient to supplement local funds"), *clarified on other grounds on denial of reh'g*, 522 F.2d 204 (5th Cir.1975); *Gardetto v. Mason*, 854 F.Supp. 1520, 1543–44 (D.Wyo.1994) (community college analogous to local school board was not entitled to Eleventh Amendment immunity when state legislature defined "local government" to include community college districts for purposes of state Governmental Claims Act; community colleges were governed by locally-elected boards of trustees; and community colleges had authority to charge tuition and

student fees and to issue revenue and general obligation bonds); *Thornquest v. King*, 626 F.Supp. 486 (M.D.Fla.1985) (community college entitled to Eleventh Amendment immunity when governing body of community colleges was appointed, approved, and confirmed by state officials and legislators; 76 percent of college's operating budget was derived from state appropriations, 20 percent was funded by student tuition and fees, and four percent came from elsewhere; and community college districts had no power to issue bonds or levy taxes); *Stones v. Los Angeles Community College Dist.*, 572 F.Supp. 1072 (C.D.Cal.1983) (community college district entitled to Eleventh Amendment immunity when state legislature retained large degree of control over community colleges; colleges performed governmental function of providing higher education; any money judgment would necessarily be satisfied with state funds; virtually all property possessed by community college district was state-owned; and substantially all of the district's funding was derived from the state itself), *aff'd*, 796 F.2d 270 (9th Cir. 1986). *See, e.g., State v. Tallon*, 196 Neb. 603, 606, 244 N.W.2d 183, 186 (1976) ("The mere granting of state aid does not render a school operation a state function" for purposes of state constitutional provision prohibiting state from levying property tax for state purposes).

I note that while I agree with Plaintiff that SCC is not entitled to Eleventh Amendment immunity, I do not reach that conclusion for the reason that any judgment entered against SCC would be paid by insurance. Rather, the proper inquiry is whether the state of Nebraska would be legally liable for payment of any judgment entered against SCC. *See Regents of Univ. of Cal. v. Doe*, 519 U.S. 425, 431, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997) (when considering whether an entity is entitled to Eleventh Amendment immunity, "it is the entity's potential legal liability, rather than its ability or inability to require a third party to reimburse it, or to discharge the liability in the first instance, that is relevant.

Surely, if the sovereign State of California should buy insurance to protect itself against potential tort liability to pedestrians stumbling on the steps of the State Capitol, it would not cease to be 'one of the United States.' "); *Duke v. Grady Municipal Schools*, 127 F.3d 972, 981 (10th Cir. 1997) (state school districts and their governing boards not entitled to Eleventh Amendment immunity from § 1983 action in federal court, despite fact that judgment against district would be paid by insurance for which premiums were funded almost exclusively by the state; focus is on legal liability for judgment, not the practical, indirect impact a judgment would have on the state treasury, and here the state of New Mexico would not be legally liable for a judgment against the school district; this approach prevents courts from having to make fact-specific determinations regarding a judgment's practical impact on the state treasury and "provides a clear and workable test in this very confused area of the law"); *In re San Juan Dupont Plaza Hotel Fire Litigation*, 888 F.2d 940, 945 (1st Cir.1989) (fact that damages might be paid by insurance carrier does not alter the fact of Eleventh Amendment immunity); *Daniel v. American Bd. of Emergency Medicine*, 988 F.Supp. 127, 158–59 (W.D.N.Y.1997) (presence of insurance does not defeat claim of Eleventh Amendment immunity) (collecting cases). *But see Pendergrass v. The Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 346 (5th Cir.) (fact that judgment would be paid by insurance and not from the state treasury weighed heavily against classifying commission as arm of the state for Eleventh Amendment purposes), *cert. denied*, 525 U.S. 1054, 119 S.Ct. 617, 142 L.Ed.2d 557 (1998); *Bockes v. Fields*, 999 F.2d 788, 790–91 (4th Cir.1993) (county department and board immune under Eleventh Amendment because their liability to plaintiff would be covered by insurance plan funded by the state), *cert. denied*, 510 U.S. 1092, 114 S.Ct. 922, 127 L.Ed.2d 216 (1994).

Accordingly,

IT IS ORDERED.

1. Defendant Southeast Community College is not an arm of the state entitled to Eleventh Amendment immunity against Plaintiff's 42 U.S.C. § 1983 First Amendment claim for money damages; and

2. This memorandum and order contains the basis for my prior order (filing 73) that defendant Southeast Community College is not an arm of the state entitled to Eleventh Amendment immunity against Plaintiff's 42 U.S.C. § 1983 First Amendment claim for money damages.