**Betty J. BLAND, Plaintiff,**

v.

**KANSAS CITY, KANSAS COMMUNITY COLLEGE, Defendant.**

No. 02–2482–JWL.

United States District Court,
D. Kansas.

July 11, 2003.

Gregory P. Goheen, McAnany, Van Cleave & Phillips, P.A., Kansas City, KS, for Defendant.

### *MEMORANDUM & ORDER*

LUNGSTRUM, District Judge.

Plaintiff filed suit against defendant alleging violations of Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. This matter is presently before the court on defendant's motion to dismiss plaintiff's complaint (doc. # 11). As set forth below, the motion is granted in part and denied in part. Specifically, the motion is denied with respect to plaintiff's ADEA claim and is otherwise granted.

The court begins its analysis of defendant's motion with those claims that plaintiff expressly concedes should be dismissed. In that regard, defendant moves to dismiss plaintiff's complaint to the extent that complaint could be read to assert claims arising under the United States Constitution. Plaintiff has clarified in her papers that she did not intend to assert such claims. Defendant's motion to dismiss those claims, then, is granted as uncontested. In addition, plaintiff consents in her papers to the dismissal of her claim

for punitive damages against defendant and, thus, defendant's motion is granted in that regard as well.

## I. Failure to Exhaust Administrative Remedies

■ The court turns, then, to plaintiff's Title VII claim, a claim that plaintiff impliedly concedes should be dismissed. Defendant moves to dismiss this claim on the grounds that plaintiff failed to exhaust her administrative remedies. According to defendant, plaintiff's charge of discrimination is totally devoid of any reference to any claim arising under Title VII. Defendant makes the same argument with regard to plaintiff's ADA claim. In her papers, plaintiff urges only that she exhausted her remedies with respect to her ADA claim by referencing her alleged disability·in the questionnaire she completed for the EEOC. She makes no mention of her Title VII claim and does not purport to suggest that any Title VII claim was preserved by virtue of her charge or her questionnaire. The court concludes, then, that plaintiff concedes that she did not exhaust her remedies with respect to this claim.

■ Even assuming plaintiff did not intend to abandon her Title VII claim by failing to mention that claim in her response to defendant's motion to dismiss, dismissal of this claim is nonetheless appropriate. Exhaustion of administrative remedies is a jurisdictional prerequisite to bringing suit under Title VII. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.1999); Seymore v. Shawver & Sons, Inc., 111 F.3d 794, 799 (10th Cir.1997). To exhaust administrative remedies, a Title VII plaintiff generally must present her claims to the EEOC as part of her timely filed EEOC "charge" for which she has received a right-to-sue letter. See Simms, 165 F.3d at 1326. The charge "shall be in writing and signed and shall be verified," 29 C.F.R. § 1601.9, and must at a minimum identify the parties and "describe generally the action or practices complained of," id. § 1601.12(b). The charge tells the EEOC what to investigate, provides it with the opportunity to conciliate the claim, and gives the charged party notice of the alleged violation. See Seymore, 111 F.3d at 799; 29 C.F.R. § 1601.14(a) (requiring EEOC generally to send copy of charge to charged party or respondent within ten days of its filing). Thus, requiring a plaintiff to have first presented her claims in her EEOC charge before being allowed to bring suit serves the dual purposes of ensuring the EEOC has the opportunity to investigate and conciliate the claims and of providing notice to the charged party of the claims against it. See Seymore, 111 F.3d at 799; cf. Schnellbaecher v. Baskin Clothing Co., 887 F.2d 124, 127 (7th Cir.1989) ("[A]llowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumvent the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge.") (quotation omitted).

On the charge form, plaintiff marked only the box referencing discrimination on the basis of age. In the "particulars" section of the charge, plaintiff wrote:

I have been employed by the above named employer since November 4, 1999, as a Child Care Teacher.

I am being paid less than younger teachers that was hired after me with less experience and less education.

I believe that I am being discriminated against because of my age (49) in viola-

tion of the Age Discrimination in Employment Act.

On its face, then, plaintiff's charge is devoid of any reference to a Title VII claim. Moreover, plaintiff's intake questionnaire-assuming for the moment that the court could consider this document for exhaustion purposes-lacks any reference to a Title VII claim. In such circumstances, it is beyond dispute that plaintiff's Title VII claim (a claim based on plaintiff's race) does not come within any of the exceptions to the exhaustion rule recognized by the Circuit; plaintiff's race claim is not "like or reasonably related to" her age discrimination claim and it is not reasonable to conclude that any alleged acts of racial discrimination would "fall within the scope of an EEOC investigation which would reasonably grow out of the charges actually made." *See Simms,* 165 F.3d at 1327; *Martin v. Nannie & the Newborns, Inc.,* 3 F.3d 1410, 1416 n. 7 (10th Cir.1993). Clearly, plaintiff has failed to exhaust her administrative remedies with respect to her Title VII claim and that claim is properly dismissed.

█ Not only does plaintiff's charge fail to mention a claim arising under Title VII, it also fails to mention any claim that might arise under the ADA. Again, as should be evident from the court's recitation of plaintiff's charge, plaintiff's charge raises only an age discrimination claim. Plaintiff concedes as much in her papers, but she nonetheless urges that her ADA claim has been exhausted because she made allegations of disability discrimination in her intake questionnaire. While the court agrees with plaintiff that her intake questionnaire contains allegations

supporting her disability discrimination claim, the court believes that the Tenth Circuit, if faced with the circumstances present here, would reject plaintiff's attempt to reach beyond the body of her charge for exhaustion purposes. As the Circuit has stated:

> [T]he formal charge is the key document in getting the Title VII [and ADA] process rolling. By statute and regulation, it must be in writing and signed under oath or affirmation, *see* 42 U.S.C. § 2000e–5(b); 29 C.F.R. § 1601.9, and it must describe the practices complained of, *see id.* § 1601.12(b). It therefore is the primary, and usually the only, place to which courts look to determine whether a plaintiff timely and properly exhausted her claims before the EEOC. Because it is the only document that must be sent to the charged party, it is the only document that can satisfy the notice requirement.

*Welsh v. City of Shawnee,* 182 F.3d 934, 1999 WL 345597, at *5 (10th Cir. June 1, 1999).[1] In *Welsh,* the Tenth Circuit rejected the plaintiff's argument that the district court should have considered her allegations of discrimination contained in an "information sheet" that she submitted to the EEOC. In doing so, the Circuit emphasized that the information sheet was not signed under oath. *See id.* at *4–5 & n. 6. According to the Circuit, plaintiff's "subsequent filing, under oath, of the charge clearly containing allegations against only McCalip regarding gender discrimination effectively negated the information sheet." *Id.* at *5. The Circuit also emphasized that there was no "clear indication" that plaintiff intended to have the EEOC investigate

---

1. Pursuant to Tenth Circuit Rule 36.3(B)(1), the court cites this unpublished opinion for its persuasive value.

the allegations in the information sheet. *See id.* at *5–6.

Here, plaintiff's intake questionnaire is not even signed by plaintiff much less signed under oath. The fact that the plaintiff's information sheet in *Welsh* was unverified was a critical component in the Circuit's decision. Thus, the court believes that the Circuit would similarly disregard the intake questionnaire here. *See also Park v. Howard Univ.*, 71 F.3d 904, 908–09 (D.C.Cir.1995) (rejecting argument that intake questionnaire should be construed as having adequately raised hostile work environment claim for exhaustion purposes where the charge itself raised only discrimination claims in part because intake questionnaire was not signed under oath), *cited with approval in Welsh*, 182 F.3d 934, 1999 WL 345597, at *5 n. 6. Moreover, there is simply no evidence before the court that plaintiff intended the EEOC to investigate the allegations contained in the intake questionnaire.[2] As the Circuit indicated in *Welsh*, while submission of the completed questionnaire itself "may be some indication that at some point she intended [the EEOC] to investigate her [disability discrimination] allegations," her subsequent timely filed formal charge, signed under oath, containing only allegations of age discrimination effectively negated the questionnaire. *Id.* at *5. Although plaintiff was proceeding pro se, anyone reading the charge would realize that it did not include allegations of disability discrimination. *Id.*

In sum, the court finds that the Tenth Circuit's decision in *Welsh*, albeit unpublished, strongly suggests that the Circuit would reject plaintiff's reliance on her intake questionnaire for exhaustion pur-

poses. As Judge Briscoe advised in *Welsh*, "[t]here is a difference between making allegations of an individual's improper conduct, even in writing, and asserting formal charges under oath ... regarding that conduct," and the court cannot conclude that plaintiff's intake questionnaire satisfies the exhaustion requirement, particularly in light of the subsequently filed and more limited formal charge. *Id.* at *6. Plaintiff's ADA claim, then, is properly dismissed.

## II. Eleventh Amendment Immunity

■ Defendant moves to dismiss plaintiff's remaining claim, her ADEA claim, on the grounds that it is immune from suit by virtue of the Eleventh Amendment. Defendant's motion in this regard is brought pursuant to Federal Rule of Civil Procedure 12(b)(1) and challenges the subject matter jurisdiction of the court. *See Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir.2002). Eleventh Amendment immunity bars damages actions against a state in federal court, even by its own citizens, unless the state waives that immunity. *See Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir.2000) (citing U.S. Const. amend. XI; *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). The Supreme Court has held that the ADEA does not abrogate Eleventh Amendment immunity and, thus, the Eleventh Amendment precludes claims under the ADEA against the states. *See Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 91, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000).

■ The question, then, is whether defendant is an entity that is entitled to

---

**2.** Plaintiff submitted an affidavit with her response to defendant's motion yet the affidavit is silent as to plaintiff's intention in completing the intake questionnaire and as to any discussions she may have had with any EEOC investigators.

**1286**

Eleventh Amendment immunity. In *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held that "[t]he bar of the Eleventh Amendment to suits in federal courts extends to States and state officials in appropriate circumstances, but does not extend to counties and similar municipal corporations." Interpreting *Mt. Healthy*, the Tenth Circuit has explained that "[t]he arm-of-the-state doctrine bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." *Watson v. University of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir.1996). In the specific context presented here, the fundamental question is whether defendant is "more like a political subdivision such as a local school district" or whether it is "an alter ego of the state such as the governing board of a state university system." *See Sturdevant*, 218 F.3d at 1162. As set forth below, the court concludes that defendant Kansas City, Kansas Community College is more akin to the former and, thus, denies defendant's motion to dismiss.

 In determining whether a particular entity is an arm of the state, the court engages in two general inquiries. First, the court examines "the degree of autonomy given to the agency, as determined by the characterization of the agen-

cy by state law and the extent of guidance and control exercised by the state." *Id.* at 1164 (quoting *Watson*, 75 F.3d at 574–75). Second, the court "examines the extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing." *Id.* (quoting *Watson*, 75 F.3d at 574–75).[3] In examining the agency's financial independence, the court considers the degree of state funding received and the agency's ability to issue bonds and levy taxes on its own behalf. *Id.* at 1166 (quoting *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1232 (10th Cir.1999)).

*A. Degree of Autonomy Enjoyed by Defendant*

In analyzing an entity's autonomy, the court looks to any particular state laws characterizing the entity and the degree of control exercised by the state over the entity. The court, then, turns to those factors.

1. Characterization Under State Law

 Although the Community College Act, *see* K.S.A. §§ 71–120 et seq. & 71–702, does not define community colleges as either arms of the state or as political subdivisions, the state legislature, for purposes of the Kansas Tort Claims Act, has defined a "municipality" to include commu-

---

3. While the entity is immune from suit "if the money judgment sought is to be satisfied out of the state treasury," *id.* (quoting *Watson*, 75 F.3d at 574–75), defendant has not provided the court with any evidence on this issue and the statutory framework sheds no light on the issue of state treasury liability. As the party asserting Eleventh Amendment immunity, it is defendant's burden to demonstrate that it is immune from suit. *See Holt ex rel. Holt v. Wesley Med. Ctr., LLC*, 2002 WL 1067677, at *1 (D.Kan. Mar.27, 2002) (citing *Teichgraeber v. Memorial Union Corp. of Emporia*, 946

F.Supp. 900, 903 (D.Kan.1996)) (collecting federal appellate cases and agreeing with cases holding that Eleventh Amendment immunity should be treated as an affirmative defense and must be proved by the party that asserts it).

Thus, the court's analysis of the immunity issue necessarily is based on other factors delineated in the Tenth Circuit's arm-of-the-state case law.

nity colleges. *See* K.S.A. § 12–105a(a). Specifically, the term "municipality" means

county, township, city, school district of whatever name or nature, community junior college,[4] municipal university, drainage district, cemetery district, fire district, and other political subdivision or taxing unit . . . .

*Id.* Significantly, the definition does not include any of the state universities, such as the University of Kansas or Kansas State University-institutions that have been recognized as arms of the state. *See Innes v. Kansas State University*, 184 F.3d 1275, 1278 (10th Cir.1999); *Brennan v. University of Kansas*, 451 F.2d 1287, 1290 (10th Cir.1971). Moreover, the Kansas Supreme Court, in analyzing whether the Kansas Turnpike Authority constitutes a "municipality" for purposes of requiring notice under the Kansas Tort Claims Act, has explained that the phrase "and other political subdivision" contained in § 12–105a(a) means that the specific entities enumerated in that section, including community colleges, are considered political subdivisions. *See Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 115, 991 P.2d 889 (1999).

Two other district courts that have examined the question of whether community colleges are considered arms of the state have looked to the particular state's Tort Claims Act for guidance as to how the state characterizes its community colleges. In *Gardetto v. Mason*, 854 F.Supp. 1520 (D.Wyo.1994), the district court concluded that a community college in Wyo-

ming was not entitled to Eleventh Amendment immunity in part because the state's Governmental Claims Act defined a "local government" to include community college districts. The court also found it significant that the state legislature did not include the University of Wyoming in the definition and noted that the University of Wyoming was considered an arm of the state. *Id.* at 1543. Similarly, in *Iowa Valley Community College District v. Plastech Exterior Sys., Inc.*, 256 F.Supp.2d 959 (S.D.Iowa 2003), the district court concluded that a community college was not entitled to Eleventh Amendment immunity. That decision was based in part on the fact that the Iowa legislature had not defined community colleges as state agencies for purposes of the State Tort Claims Act. *See id.* at 965.

In sum, to the extent community colleges have been characterized by Kansas state law, they have been characterized as municipalities rather than as arms of the state. Indeed, even the Kansas Supreme Court has analogized community colleges to "other school districts" in light of their ability to levy taxes-a factor that this court discusses later in this opinion. *See State ex rel. Londerholm v. Hayden*, 197 Kan. 199, 200, 416 P.2d 61 (1966). Thus, Kansas state law demonstrates that community colleges in Kansas are municipalities or political subdivisions for purposes of Eleventh Amendment analysis. *See Ambus v. Granite Board of Ed.*, 995 F.2d 992, 995 (10th Cir.1993) (concluding that school districts were not arms of the state in part because the school districts were explicitly

---

4. The phrase "community junior college" is the equivalent of a "community college" as otherwise described in this opinion. *See* K.S.A. §§ 71–120(a) (officially designating community junior colleges as community colleges) & 71–120(b) (whenever a community college is referred to as a "community junior college" in a statute, contract or other document, "such reference or designation shall be deemed to apply to said community colleges").

characterized by Utah law as political sub-divisions). .

## 2. Guidance and Control Exercised by the State over Defendant

In assessing the degree of control exercised by the state over defendant, the court looks primarily to the governing statutory provisions. A review of those provisions confirms that defendant enjoys significant autonomy and that it is not so controlled by the state as to be an arm of the state. Significantly, each community college, including defendant, is governed by a board of trustees whose members are locally elected. K.S.A. § 71–1403. In this respect, the board of trustees of a community college in Kansas differs significantly from the state board of regents. *Compare* K.S.A. § 74–3202a(a) (Kansas state board of regents is composed of nine members appointed by the governor). In *Ambus*, in which the Tenth Circuit concluded that local school boards were political subdivisions, the Circuit "gave significant weight to the fact that local school boards, *which consist of members who are locally elected,* exercise responsibilities free from state control." *Sturdevant,* 218 F.3d at 1168 (emphasis in original). By contrast, in *Watson v. University of Utah Med. Ctr.,* 75 F.3d 569, 575 (10th Cir.1996), in which the court found arm-of-the-state status, the Circuit "placed emphasis on the fact that the University was controlled by a sixteen-member board of regents, fifteen of whom were appointed by the Governor." *Id.* (quoting *Sutton v. Utah State Sch. for the Deaf & Blind,* 173 F.3d 1226, 1233 (10th Cir.1999)). Here, defendant is far more closely analogous to the local school boards in *Ambus,* being governed by a board comprised of locally elected members, than it is to the University of Utah's governing board of regents in *Watson.* In

short, the fact that defendant is governed by a locally elected board of trustees weighs strongly in favor of political subdivision status. *See Iowa Valley Community College,* 256 F.Supp.2d at 965 (community college not entitled to Eleventh Amendment immunity in part because it was governed by a locally elected board of directors); *Griner v. Southeast Community College,* 95 F.Supp.2d 1054, 1058 (D.Neb.2000) `(same); *Gardetto,* 854 F.Supp. at 1544 (same).

Moreover, the Community College Act gives each board of trustees responsibility "for the operation, management and control of the college." K.S.A. § 71–201(a). The Act specifically grants each board of trustees the power to sue and be sued; to determine the educational program of the college; to enter into contracts; to accept money "which the board may use for or in aid of any of its purposes;" to acquire real or personal property; and to enter into lease agreements. *Id.* § 71–201(b). While each board of trustees must exercise its powers "in accordance with the provisions of law and the rules and regulations of the state board of regents," *id.* § 71–201(a), defendant's suggestion that the state board of regents controls and supervises each board of trustees is simply not an accurate characterization of the relationship. In fact, the state legislature has emphasized that "notwithstanding any of the powers, duties and functions conferred and imposed upon the state board of regents ... the boards of trustees of the community colleges shall continue to have custody of and be responsible for the property of their respective community colleges and shall be responsible for the operation, management and control of such community colleges ...." *Id.* § 74–3202c(c).

To the extent the state board of regents can be said to "supervise" community col-

leges in the state, that "supervision" does not concern the day-to-day operations or management of the colleges, but rather the overall coordination of all postsecondary educational institutions as they relate to one another. As indicated in the revisor's note preceding the Kansas Higher Education Coordination Act, K.S.A. § 74–3201 et seq., the state board of regents was reconstituted by 1999 Senate Bill No. 345 and the reconstituted board "retained all of the powers, duties and functions of the former state board of regents and was given additional authority to supervise and coordinate the entire system of postsecondary education in Kansas." In that regard, it is not the role of the state board of regents to control or govern individual community colleges, see K.S.A. § 74–3202c(c), but to act as an "advocate for the provision of adequate resources and sufficient authority for all postsecondary educational institutions." Id. § 74–3202c(a). The state board of regents serves as the representative of all postsecondary educational institutions before the governor and the state legislature, coordinates all program offerings by the postsecondary schools, and studies ways to maximize the utilization of resources available for higher education in Kansas. See id. § 74–3202(b).

Significantly, defendant has presented the court with no evidence that the state board of regents controls or governs its daily operations or management in any respect. In the absence of such evidence, the court has only the statutory framework to guide its conclusion. After carefully reviewing the provisions in that framework, the court concludes that the state board of regents does not "control" defendant in such a way as to render defendant an arm of the state. The legislature has expressly stated that each community college is to be governed by a locally elected board of trustees and that each board of trustees is responsible for the operation, management and control of its college. The coordination role played by the state board of regents with respect to all postsecondary schools is simply insufficient to render a community college an arm of the state. See Griner, 95 F.Supp.2d at 1058–59 (coordination role played by Coordinating Commission for Higher Education not construed as "state control" for purposes of Eleventh Amendment analysis). In fact, the legislature has provided that despite such coordination, the boards of trustees of the community colleges in the state retain the responsibility to control those colleges. Id. §§ 74–3202c(c) & 74–32,140(a) & (h) (despite coordination role, "community colleges shall continue to be operated, managed and controlled by locally elected boards of trustees;" coordination effort "shall not be construed in any manner so as to change or affect the operation, management and control of any community college or to change or affect any existing power, duty or function of a board of trustees with respect to such operation, management and control").

For the foregoing reasons, the court concludes that considerations of autonomy and control weigh in favor of characterizing defendant as a political subdivision rather than as an arm of the state.

## B. Degree of Financial Independence Enjoyed by Defendant

As noted above, the two primary factors to consider when assessing an agency's financial independence are the agency's ability to issue bonds and levy taxes on its own behalf and the degree of state funding received. See Sturdevant, 218 F.3d at 1169. While these factors overlap somewhat with the question of whether a judg-

ment against the defendant would be paid out of the state treasury—a question that this court cannot answer, *see supra* note 3—uncertainty as to liability does not preclude consideration of other aspects of the financial relationship between the state and the entity to provide guidance in applying the arm-of-the-state analysis. *Id.*

### 1. Ability to Issue Bonds and Levy Taxes

The court, then, turns to examine whether defendant has the power to issue bonds and levy taxes and concludes that this factor clearly favors a finding of political subdivision status as opposed to arm-of-the-state status. Pursuant to state statute, defendant's Board of Trustees is authorized, with certain limits, to issue and sell general obligation bonds. K.S.A. § 71–201(c). More significantly, defendant's Board of Trustees has the power to levy taxes-a "characteristic attribute of political subdivisions." *See Sturdevant,* 218 F.3d at 1170 (entity's lack of taxing authority ultimately tipped the balance towards a finding of arm-of-the-state status). Specifically, defendant's Board of Trustees (and, of course, the board of trustees of any community college in the state) is authorized, for the purpose of community college maintenance and operation, to levy a tax on the taxable tangible property of the community college district. K.S.A. § 71–204(a). In addition, the board of trustees of any community college is authorized to make an annual tax levy for a period not to exceed five years upon all taxable tangible property in the community college district for the acquisition of real property for use as building sites or for educational programs and for the purpose of construction, reconstruction, repair, remodeling, additions to, furnishing and equipping of community college buildings. *Id.* § 71–501(a). This factor, then, sup-

ports the court's conclusion that defendant functions as a political subdivision. *See Iowa Valley Community College Dist. v. Plastech Exterior Sys., Inc.,* 256 F.Supp.2d 959, 966 (S.D.Iowa 2003) (concluding that community college was not entitled to Eleventh Amendment immunity in part because college had the authority to levy taxes); *Griner v. Southeast Community College,* 95 F.Supp.2d 1054, 1059 (D.Neb. 2000) (same).

### 2. State Funding Received

Kansas community colleges receive revenue from local taxes, tuition payments and state aid. *See, e.g.,* K.S.A. § 71–620(a). While there is no evidence before the court concerning what percentage of defendant's budget comes from state funding, even assuming the percentage was significant, the court would nonetheless conclude that defendant is not an arm of the state. As the Tenth Circuit acknowledged in *Sturdevant,* the financial affairs of many local school districts are often dependent on legislative appropriations and those school districts are nonetheless considered political subdivisions. *See Sturdevant,* 218 F.3d at 1169–70. Moreover, there is no indication in the record or the relevant statutory framework that the state controls or supervises the means by which a Kansas community college spends the monies appropriated to it. In such circumstances, the mere fact that defendant relies on state aid is insufficient to render it an arm of the state. *Id.* (a local school district's reliance in practice on state grants is qualitatively different than a state's direct supervision over the means by which the agency spends its money); *accord Ambus v. Granite Board of Educ.,* 995 F.2d 992, 996–97 (10th Cir.1993) (concluding that local school district was not an arm of the state for Eleventh Amendment purposes

despite finding that 62% of the school district's budget came from state grants; school district received funding "at least in part" through locally administered property taxes).

In sum, considering the various factors in context and examining the pertinent statutory scheme, the court concludes that defendant is not an instrumentality of the state. Community colleges are considered municipalities or political subdivisions under Kansas law, are controlled and operated by the local community rather than the state as a whole, and obtain funding at least in part through locally administered property taxes. Thus, defendant, because it is not an arm of the state, does not enjoy Eleventh Amendment immunity and defendant's motion to dismiss is denied on this issue.

### III. Service of Process

■ The only remaining issue, then, is whether defendant has been properly served. According to defendant, plaintiff has failed to effect proper service in this case. The parties' briefs indicate that plaintiff attempted to serve David Duckers, the individual whom she believed was defendant's registered agent, that Mr. Duckers informed her that John Jurcyk was defendant's registered agent, and that plaintiff then served Mr. Jurcyk's secretary. Defendant contends that Mr. Jurcyk is not its registered agent but, perhaps not surprisingly, offers no guidance as to how plaintiff might obtain proper service. The court agrees with defendant that the attempted service on Mr. Jurcyk was not sufficient but, as explained below, believes that plaintiff is entitled to additional time to effect service.

■ The Tenth Circuit has recently cautioned that a district court should not dismiss a pro se plaintiff's complaint for failure to effect proper service without first providing the plaintiff with specific instructions on how to correct the defects in service, particularly where, as here, the plaintiff has demonstrated sincere efforts to comply with service requirements. *See Olsen v. Mapes,* 333 F.3d 1199, at 1204–05 (10th Cir.2003). Bearing the *Mapes* decision in mind, the court will give plaintiff additional time to obtain proper service in this case. Moreover, plaintiff is advised that because defendant is not "an individual, partnership, association or corporation," it is not permitted to appoint a registered agent. *See* K.S.A. § 60–306.[5] Thus, plaintiff should not attempt to serve any alleged registered agent. Rather, plaintiff should serve either defendant's president,[6] *see* Fed.R.Civ.P. 4(j)(2), or "the clerk or secretary or, if not to be found, … any officer, director or manager" of defendant. *See* K.S.A. § 60–304(d)(4). Proper service, and proof thereof, must be made no later than Monday, August 25, 2003.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant's motion to dismiss is granted in part and denied in part. The motion is granted with respect to plaintiff's constitutional claims, Title VII claims, ADA claims and her claim for punitive damages. The motion is denied with

---

**5.** A search on the Kansas Secretary of State's website reveals that David Duckers is the registered agent for the Kansas City Kansas Community College Endowment, which is a separate entity from the community college itself.

**6.** Defendant's official website indicates that defendant's president is Dr. Thomas Burke and that his office is located in defendant's Upper Social Science Building. *See* http://www.kckcc.cc.ks.us.

respect to plaintiff's ADEA claim. Moreover, plaintiff must properly serve defendant with process no later than August 25, 2003.

**IT IS FURTHER ORDERED BY THE COURT THAT** the stay entered in this case on June 23, 2003 is hereby lifted and the parties are directed to contact Magistrate Judge Waxse's chambers to coordinate further scheduling matters.

**IT IS SO ORDERED.**